CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/6/2018
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| W.C. ENGLISH, INC., | CASE NO. 6:17-CV-00018 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| RUMMEL, KLEPPER & KAHL, LLP, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

This case concerns a contract dispute between the construction company W.C. English, Inc. ("English") and two of its inspectors: Rummel, Klepper & Kahl, LLP ("RK&K") and CDM Smith, Inc. ("CDM Smith"). English won a Virginia Department of Transportation ("VDOT") bid to build a bridge across I-81, near Lexington, Virginia. As part of the job, it was required to hire inspectors to verify that the construction of the bridge conformed to VDOT's quality standards. It hired RK&K and CDM Smith. During the bridge's construction, English switched the size of the steel supports that it was using. Employees of all three companies were aware of this change. Because of this change, the bridge did not meet VDOT's standards. VDOT required English to tear the bridge down and rebuild it. English sued RK&K and CDM Smith for breaching their contracts (Counts I and III) and for indemnification (Counts II and IV). RK&K and CDM Smith counterclaimed for unpaid fees.

The parties have now filed cross-motions for summary judgment on all claims and counterclaims, (dkts. 43, 54, 56, 58), and English has also filed motions to exclude the defendant's experts. (Dkts. 50, 46). I will grant the defendants' motions because English was fundamentally responsible for its own damages. It, and neither of its inspectors, changed the structure of the bridge; it cannot now hold its inspectors liable as guarantors of its work. Relatedly, both defendants are entitled to their unpaid fees, and so I grant their motions for

summary judgment on the counterclaims.  Because I grant the defendants summary judgment, I do not reach English's motions to exclude the defendants' experts from testifying at trial.[1]

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When considering cross-motions for summary judgment, the court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014).

## II. FACTS

I must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  Because I first address the defendants' motions for summary judgment, this recitation of the facts draws all reasonable inferences in the English's favor.

### A.  The contract formation

On February 20, 2009, VDOT and English entered into a contract for the construction of a bridge over I-81.  (Dkt. 55-1 at ECF 3, 23).  English was responsible to VDOT for designing and constructing the bridge to certain specifications.  (*Id.* at ECF 5).

---

[1]     Both experts were offered to testify about the parties' standards of care under the contract.  This testimony would simply be that the parties were required to follow their respective contracts, a position that is not disputed by English.  Neither defendant relies on the expert testimony in their motions for summary judgment.  Accordingly, I rule on the motions for summary judgment without relying on the experts' testimony or reaching the motions to exclude.

To assist it with its design, English entered into a subcontract with the engineering firm AECOM. (Dkt. 55-2). Per its contracts with the other parties, English was required to build the bridge in accordance with AECOM's approved plans. (Dkt. 55-5 at ECF 20; dkt. 55-6 at ECF 16). English was required to get any change to the bridge design approved through written requests submitted to AECOM. (Dkt. 55-3 at ECF 9, 12). AECOM was then responsible for making sure that any requested revision to the design would still meet VDOT standards. (*Id.* at ECF 13).

To assist it with its construction, English entered into subcontracts with two inspectors. English entered into a "quality assurance" services contract with RK&K on October 6, 2009. (Dkt. 55-6). RK&K's quality assurance responsibilities involved inspecting whether construction of the project conformed with the contract documents and VDOT standards. (Dkt. 59-9). RK&K was to keep written documentation of these inspections, including the identification of any potential quality and non-conforming work issues. (Dkt. 59-4 at ECF 5). RK&K had the authority to advise VDOT not to pay English if the project was not in conformity with the plans. (Dkt. 14-2 at ECF 137; dkt. 43-16; dkt. 59-4 at ECF 3).

English also entered into a subcontract with CDM Smith on March 26, 2009 for "quality control" services. (Dkt. 43-5). CDM Smith's quality control responsibilities involved measuring "quality characteristics" and inspecting construction to make sure the work conformed to the plan and regulations. (Dkt. 59-9). Taken together, these contracts anticipate a clear hierarchy: English retained ultimate responsibility, RK&K oversaw inspection, and CDM Smith fell under both RK&K's and English's leadership.

**B. The quality assurance and quality control plan**

English, RK&K, and CDM Smith jointly developed an overall quality assurance and quality control plan that specified the parties' roles. (Dkt. 14-1; dkt. 14-2; dkt. 57-2; dkt. 59-6 at ECF 11). This plan is part of English's contracts with both defendants. Under this plan, English was still "ultimately responsible for the quality of the construction." (Dkt. 14-2 at ECF 57). The plan envisioned that a few individuals would oversee the project for English. Bernard Davis was the leader of English's team throughout the relevant time period. (Dkt. 14-1 at ECF 3). Gary Galloway became English's construction manager in 2010. (Dkt. 70-1 at ECF 74; dkt. 59-5 at ECF 3-4). Dylan Frazier was English's project coordinator, and he would replace Galloway as construction manager during the course of construction. (Dkt. 55-4 at ECF 6, 21, 46). It is unclear when exactly this transition occurred. (Dkt. 43-6 at ECF 27).

According to this contract, RK&K's primary role was "to ensure the work conforms to the 'approved for construction' plans and VDOT specifications by reviewing the QC data and performing independent sampling and testing to verify the QC test results." (Dkt. 14-2 at ECF 58). RK&K had no direct control over English's construction means or methods. (Dkt. 55-6 at ECF 16). The plan envisioned that Richard Clarke would oversee RK&K's team of inspectors. (Dkt. 59-5 at ECF 3).

CDM Smith's primary role was to measure and then report samples and inspection results to RK&K. (Dkt. 14-2 at ECF 140; dkt. 57-7 at ECF 2). CDM Smith likewise had no direct control over English's construction means or methods. (Dkt. 43-6 at ECF 17). Terry Oliver was CDM Smith's manager on the project. (Dkt. 43-26 at ECF 16).

Importantly, the overall plan lays out different responses that specifically correspond to different levels of "non-conformities." (Dkt. 14-2 at ECF 66). For the lowest level of non-

conformity, a CDM Smith inspector could verbally address the problem with English's foreman and the problem could be fixed immediately. (*Id.*). The CDM Smith inspector was required to record this exchange in his project diary. (*Id.*). The second level of non-conformity concerned issues that could not be addressed immediately. (*Id.*). For these issues, the CDM Smith inspector was required to notify English's foreman and then alert RK&K about the issue. (*Id.*). CDM Smith would address the issue together with RK&K, but RK&K had final responsibility to determine that the issue was resolved. (*Id.*). This is because RK&K, but not CDM Smith, had the authority to withhold VDOT payments if the issue was not corrected. (Dkt. 59-4 at ECF 3). The most serious level of non-conformity occurred if English, RK&K, and CDM Smith could not agree on a way to resolve issues or deficiencies. (Dkt. 14-2 at ECF 66; *id.* at ECF 144 ("If the issues or deficiencies cannot be resolved, the inspector will advise [RK&K] and initiate a Non-Conformance Report (NCR).")). Non-conformities of this sort involved an even more involved dispute resolution framework. (Dkt. 14-2 at ECF 66). Finally, if work was not in conformity, English and VDOT could still make a final determination to accept the work as non-conforming. (*Id.*). If they did so, RK&K was required to document the basis of acceptance. (*Id.*).

Some more general language in other parts of the plan is in tension with this specific framework for resolving non-conformities. For example, one part of plan states that non-conformance reports should be issued "for all non-conforming work," not only that more "serious" category of the issues that could not be resolved. (Dkt. 14-2 at ECF 66, 142). Other parts of the plan state that CDM Smith must report "any" non-conformities to English's construction manager. (Dkt. 14-2 at ECF 142, 144).

## C. The error on the bridge

VDOT regulations and the bridge's design required steel reinforcement that would be covered by concrete. (Dkt. 57-11; dkt. 57-12 at ECF 4). These regulations then specified how much "cover," or concrete on top of the steel, would be required. (Dkt. 57-12 at ECF 4). English started out installing 2.5 inch "slab runners," the industry name for the steel reinforcements, in the bridge construction. (Dkt. 55-5 at ECF 6, 21). But they stopped when they were in between one third and one half of the way through the construction of the bridge. (*Id.*). At that point, a switch was made to 1.75 inch slab runners. The move to use the shorter slab runners caused excess concrete cover over the top of the steel reinforcements and eventually was the source of the non-conformity that forced English to replace the bridge. (Dkt. 55-3 at ECF 51; dkt. 55-4 at ECF 18-20).

This mistake was an overcorrection to a previous mistake. On another bridge built by English, it had not included enough concrete cover between the steel support and the road. (Dkt. 43-6 at ECF 18; dkt. 55-4 at ECF 16). Matthew Hackney, English's bridge superintendent, and Dylan Frazier, English's project manager who became their construction manager, discussed the problem with RK&K's Richard Clarke on April 6, 2012. (Dkt. 55-11; Dkt. 55-21; dkt. 59-19 at ECF 7-8). Together, they made the decision that English would use the shorter slab runners. (Dkt. 43-6 at ECF 18; dkt. 55-11; dkt. 55-21; dkt. 59-19 at ECF 7-8). CDM Smith did not play a role in this decision. (Dkt. 43-7 at ECF 17). After this decision was made by English and RK&K, a CDM Smith inspector, Khairy Wahba, let a foreman know that his installation of the taller slab runners did not conform to the changed plan. (Dkt. 62-3 at ECF 6-7; dkt. 62-4 at ECF 1-2). English ordered shorter slab runners for the bridge deck, and began using them to finish the bridge. (Dkt. 55-3 at ECF 21; dkt. 55-4 at ECF 17; dkt. 55-13).

**D. The error goes uncorrected**

Victor Niagro, a CDM Smith inspector, provided written notification to English of the problem with the spacing above the steel reinforcement on April 21, 2012. (Dkt. 43-25; Dkt. 62-5 at ECF 6, 11-12, 19; dkt. 57-10 at ECF 6-9, 11-13). He also discussed the problem with English's Foreman, Matthew Hackney. (Dkt. 43-25). On the day of the pour, April 24, 2012, Khairy Wahba of CDM Smith verbally told English and RK&K that the concrete cover was greater than the tolerance approved in the AECOM drawings. (Dkt. 57-9 at ECF 11-13, 20-25). Wahba also recorded the nonconforming measurements and showed them to Hackney, of English, and Clarke, of RK&K. (*Id.*). Clarke reviewed CDM Smith's measurements and raised similar concerns about the spacing of the slab runners with English. (Dkt. 55-4 at ECF 33; dkt. 59-10 at ECF 17-20). RK&K did not file a written report of any non-conformance. (Dkt. 59-11 at ECF 20-21; dkt. 59-23).

RK&K and CDM Smith both believed English had cured their concerns before the concrete pour. (Dkt. 55-9 at ECF 11-12; dkt. 57-17; dkt. 59-24). English moved forward and poured concrete over the steel reinforcement.

**E. VDOT discovers the error**

After the bridge was largely finished, VDOT conducted an inspection that noted concerns about the excessive concrete cover (caused by the decrease in slab runner size), and asked for calculations to determine whether it would affect deck structural capacity. (Dkt. 43-18 at ECF 1). After finishing its investigation, VDOT rejected the bridge as non-conforming and asked English to tear down and rebuild the bridge. (Dkt. 57-19; dkt. 57-20; dkt. 57-21). English eventually rebuilt the bridge under protest, denying that there were any structural problems.

(Dkt. 43-35).  English and VDOT settled, with English receiving a reduction in the amount of liquidated damages assessed by VDOT.  (Dkt. 55-19).

### III. DISCUSSION OF RK&K'S MOTION FOR SUMMARY JUDGMENT

Count I alleges that RK&K breached its contract with English.  Under Virginia law, a plaintiff must establish three elements to demonstrate breach of contract: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344 (2016).  Count II alleges that English has a contractual right to be indemnified for the damages it incurred in tearing down and rebuilding the bridge.  RK&K's counterclaim alleges that English did not finish paying for the services rendered by RK&K, and asks for that payment.

RK&K treats English's two separate claims together, arguing: (1) the third element of the breach of contract claim has not been satisfied because the terms of the contract absolve RK&K of liability if English was negligent; and (2) English has no right to indemnity because, again, the terms of the contract exempt RK&K from liability if English was negligent.  Thus, its argument boils down to that one point: English is entitled to no damages because the terms of its contract demonstrate that RK&K is exempt from liability if English was negligent.  Viewing the evidence in English's favor, I grant RK&K's motion for summary judgment on English's claims. Additionally, the parties do not dispute that English never paid RK&K for its final invoices. RK&K is also entitled to summary judgment on its counterclaim for those fees.

## A. The Court's previous opinion

The Court issued an opinion in this case denying RK&K's motion to dismiss.  (Dkt. 36).[2] The opinion's central holding was that "there is ambiguity in the subcontract—the resolution of which is an issue of fact that cannot be settled at [the motion to dismiss] stage."  (*Id.* at 1).  This ambiguity arose because the two terms sheets contain clauses that contradict each other. English's terms sheet envisions at least some circumstances where RK&K would be required to indemnify English; RK&K's does not.  *Compare* dkt. 21-1 at ECF 20 ("Subcontractor shall indemnify and save harmless Contractor . . .") *with id.* at ECF 16 ("RK&K is not responsible for the Contractor[s] failure to perform the construction work in accordance with the Construction documents.").  Under Virginia law, which of these terms control is a factual question.  Dkt. 36 at 8 (citing *Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992)); *see also Nehi Bottling Co. v. All-Am. Bottling Corp.*, 8 F.3d 157, 161–62 (4th Cir. 1993) ("[I]f the situation is such that fair-minded men might reasonably draw different conclusions [from the evidence], then the construction of the contract is for the jury under proper instructions from the court, even though the evidence [is] not conflicting.").

The Court denied the motion to dismiss because English had pled facts (namely that RK&K had breached its contractual duties) that, if inferences were drawn in English's favor and its terms sheet governed, would plausibly result in RK&K's liability.  The Court did not address whether RK&K would be liable if English had also been at fault for the damage.  This possibility was not addressed because the complaint did not allege that English had violated its contractual duties; it only alleged that RK&K had violated its contractual duties.

---

[2]     The opinion did not address the English's separate contract with CDM Smith.

The dispute over which terms are part of the contract remains a genuine issue of material fact that could prevent the entry of summary judgment. *See Commercial Union Ins. Co. v. Charleston Marine Leasing Co.*, 843 F. Supp. 124, 128 (E.D. Va. 1994), *aff'd*, 52 F.3d 320 (4th Cir. 1995); *Brown v. Slenker*, 220 F.3d 411, 425 (5th Cir. 2000) ("[T]he issue of whether the Letter constituted a contract by which the Defendants agreed to represent the Commissioner, and whether the Defendants breached that contract, should have been submitted to the jury." (applying Virginia law)). In order to receive summary judgment, then, each party must assume the other party's terms sheet governs.

## B.  What do English's terms mean?

So for RK&K to prevail, the Court must work under the assumption that the English's terms govern RK&K's liability to English. There are three paragraphs in English's terms sheet that set out RK&K's potential liability.[3] The "Indemnity" section of the terms sheet contains the first two of these paragraphs:

> To the full extent permitted by law, Subcontractor agrees to indemnify and save harmless Contractor and Owner . . . against any claim, cost, expense, or liability (including attorney's fees), attributable to bodily injury, sickness, disease or death, or to damages or destruction of property (including loss of use thereof), caused by the negligent performance of the Work of the Subcontractor . . . provided, however, *Subcontractor's duty hereunder shall not arise if such injury, sickness, death, damage, or destruction is caused by the negligence of a party indemnified hereunder*, or by their subcontractors or consultants of any tier. . . .
>
> Should Owner or any other person assert a claim or institute a suit, action or proceeding against Contractor involving the manner or sufficiency of the Work, Subcontractor shall indemnify and save harmless Contractor and its servants and employees, from and against any liability, loss, damage, or expense arising out of

---

[3]    English argues that the "law of the case" doctrine means that only the paragraph cited in the prior opinion should be considered. (Dkt. 30 at ECF 5-6). This overreads the previous opinion. Only the one paragraph was quoted because that paragraph was sufficient to demonstrate the conflict between the terms sheets. The opinion did not state, *contra* English's reading of the opinion, that the quoted paragraph provided the only terms in English's terms sheet that addressed RK&K's liability. All three of these should be read paragraphs together.

or relate [*sic*] to such claim, suit, action, or proceeding, *to the extent directly caused by the negligence of subcontractor but not to the extent caused by the acts or omissions of Contractor* or its subcontractors or consultants of any tier.

(Dkt. 21-1 at ECF 20) (emphasis added). The third relevant paragraph is found in the "Damage" section of the terms sheet. In the relevant part, it states:

*Except if due to Contractor's negligence*, Contractor shall not be liable or responsible for any loss or damage to the Work, and Subcontractor shall be responsible for the correction or restoration of any such loss or damage to the Work, or to the work of Contractor or any other subcontractor, resulting from the operations of Subcontractor, or its subcontractors, agents, servants or employees hereunder.

(*Id.* at ECF 22) (emphasis added).[4] These three paragraphs must be read together.

"[I]n construing contract documents as a whole, the court will not treat any word or clause as meaningless if any reasonable interpretation consistent with the other portions of the contract can be ascribed to it." *First Am. Bank of Virginia v. J.S.C. Concrete Const., Inc.*, 259 Va. 60, 69 (2000). So I bring the most salient parts of each of the above paragraphs together to construe the contract's meaning. RK&K is liable for damages "to the extent directly caused by the negligence of [RK&K] but not to the extent caused by the acts or omissions of [English]." (Dkt. 21-1 at ECF 20). RK&K agrees to indemnify English for damages "caused by the

---

[4]     The capitalized term "Work" is set out as a defined term, meaning "the work identified and described in Schedule A attached hereto." (Dkt. 21-1 at ECF 18). Schedule A identifies the work as the "Quality Assurance Services" that RK&K was to provide to English. (*Id.* at ECF 2). However, the terms sheet continuously uses this term to mean all of the work done by English for VDOT, not just the quality assurance work that RK&K provided to English. For example, the very sentence that defines "Work" continues to say that this "Work" is "a portion of the Work required of Contractor under the Contract between Owner and Contractor." (*Id.* at ECF 18). Reading this second use of the capitalized term in accordance with its just-provided definition leads to a logical absurdity: the quality assurance services that RK&K was to provide to English (the defined meaning) is only a portion of the very same quality assurance services that RK&K was to provide to English. Instead, this second use of "Work" appears to reference English's larger work for VDOT (*i.e.,* the bridge). Likewise, it is hard to understand what damage to the "Work," as used in "Damages" paragraph, could mean except damage to the bridge; the services themselves could not be damaged. (*Id.* at ECF 22). In sum, the definition of the term is inconclusive because of these internal contradictory uses of the term, and so the term must be read in context each time it is used.

11

negligent performance of [RK&K's work]" unless the injury "is caused by the negligence of" English. (*Id.*). And "[e]xcept if due to [English]'s negligence, [English] shall not be liable or responsible for any loss or damage to [RK&K's work], and [RK&K] shall be responsible for the correction or restoration of any such loss or damage to [RK&K's work], or to the work of [English] or any other subcontractor, resulting from the operations of [RK&K]." (*Id.* at ECF 29).[5] If "two provisions of [this] contract appear to be mutually conflicting, they should be reconciled if a reasonable basis for reconciliation is afforded by the instrument's language." *First Am. Bank of Virginia*, 259 Va. at 69.

Unlike the ambiguity created by the competing terms sheets, these terms can be reasonably reconciled. Doing so leads to a reading that is similar to the tort concept of contributory negligence: if English was a cause of its own damages it cannot collect. While the second and third of these lines certainly envision this reading ("[RK&K's] duty [to indemnify] shall not arise if such [damages are] caused by the negligence of [English]" and "[e]xcept if due to [English's] negligence"), the first could possibly be read to anticipate something akin to the tort concept of comparatory negligence ("to the extent directly caused by . . ."). But it is

---

[5]      English argues that the first clause in this sentence ("Except if due to Contractor's negligence") only modifies the first independent clause ("Contractor shall not be liable or responsible for any loss or damage to the Work") and not the second ("Subcontractor shall be responsible for the correction . . ."). This rule of construction may provide guidance in some situations, but here English ignores the fact that RK&K *handwrote* this first clause before this and the preceding sentence of the contract:

┌─ Except if due to Contractor's negligence;
23.      **Damage.** └ Contractor shall not be liable or responsible for loss or damage to the equipment, tools, facilities, or other personal property owned, rented or used by Subcontractor, or anyone employed by Subcontractor, in the performance of the Work; and Subcontractor shall maintain such insurance and take such protective action as it deems desirable with respect to such property. Contractor shall not be liable or responsible for any loss or damage to the Work, and Subcontractor shall be responsible for the correction or restoration of any such loss or damage to the Work, or to the work of Contractor or any other subcontractor, resulting from the operations of Subcontractor, or its subcontractors, agents, servants or employees hereunder. Subcontractor shall take reasonable precautions to protect the Work from loss or damage prior to acceptance by Owner.   └ Except if due to Contractor's negligence,

(*See* dkt. 21-1 at ECF 22). This handwriting evidences the parties' intent that this qualifier ("Except if due to Contractor's negligence") would apply to the entire sentence, not merely the first independent clause.

important to focus on this first sentence's use of "directly." This term was handwritten into the contract by RK&K. (Dkt. 21-1 at ECF 20). The use of this word here is best read as "proximately." *See, e.g., Estate of Moses ex rel. Moses v. Sw. Virginia Transit Mgmt. Co.*, 273 Va. 672, 679 (2007) (equating "proximate cause," "direct," and "efficient contributing cause" in the tort context). When read this way, this sentence states that RK&K is liable for damages "to the extent [proximately] caused by the negligence of [RK&K] but not to the extent caused by the acts or omissions of [English]." (Dkt. 21-1 at ECF 20).[6] This reading demonstrates that RK&K agreed to liability when the dual requirements of contributory negligence were satisfied: RK&K would be liable for damages and would indemnify English when RK&K's conduct consisted of "negligence and proximate causation." *Rascher v. Friend*, 279 Va. 370, 375 (2010). But RK&K would not be liable if damages were caused by English, unless it (RK&K) directly or proximately caused the injury.

**C. Is RK&K entitled to summary judgment under those terms?**

RK&K is entitled to summary judgment on the claims against it because there is no genuine dispute that English's negligence was the cause of its own injury. This negligence absolved RK&K of both contractual and indemnity liability.

---

[6]    English appears to underestimate the import of the use of "directly." (*See* dkt. 70 at ECF 8 (stating "RK&K remains liable to English for its breach of contract and indemnity to the extent caused by RK&K's negligence," but omitting the word "directly"). At argument, English claimed that "directly" should be read in light of the distinction between direct and consequential damages in Virginia law. In Virginia, direct damages "are damages which, in the ordinary course of human experience, can be expected to result from a breach." *Blue Stone Land Co. v. Neff*, 259 Va. 273, 278 (2000). Consequential damages "are those which arise from the intervention of "special circumstances" not ordinarily predictable." *Id.* Direct damages are compensable, but consequential damages are "compensable only if it is determined that the special circumstances were within the 'contemplation' of both contracting parties." *Id.* Here then, there would be no significance to the introduction of "directly" because direct damages are always compensable. I do not find English's argument on this point persuasive.

English's negligence is important because the parties contracted to terms that made it important.[7]  This incorporation of the concept of negligence into the terms of a contract is common.  *See, e.g., United States v. Seckinger*, 397 U.S. 203, 204 (1970).  English's standard of care was to follow its contractual obligations.  (*See* dkt. 51 at ECF 9 ("English does not dispute that its standard of care to VDOT on the Project was to follow the contract documents.")).[8]  And so whether English was negligent, for purposes of these clauses, merely is a question of whether it materially failed to follow those documents.  *Daniel Const. Co. v. Welch Contracting Corp.*, 335 F. Supp. 303, 306 (E.D. Va. 1971) (evaluating negligence under an indemnity clause by asking whether subcontractor satisfied the terms of its contract); *Willner v. Woodward*, 201 Va. 104, 104-08 (1959); *Surf Realty Corp. v. Standing*, 195 Va. 431, 443 (1953) (affirming a holding that an architect supervising construction was negligent when he failed to discover a deviation from the plans).  For at the least the following three reasons, it is clear that English did not meet those obligations and that these failures caused its injury.  Accordingly, it is not entitled to seek damages or indemnification from RK&K.

---

[7]     English protests that consideration of "negligence" turns this contract action into a tort action.  (Dkt. 70 at ECF 7).  It cites multiple cases where Virginia courts have refused to turn contractual disputes into torts.  (Dkt. 70 at ECF 9-11).  But the difference between this case and those cases is that this contract expressly incorporated negligence into the terms of the contract.

[8]     English acknowledges that the contract established its standard of care towards VDOT, but disagrees that this standard of care is relevant to the use of "negligence" in its subcontract with the defendants.  But the use of "negligence" in these sorts of clauses frequently invokes independent duties to third parties.  For example, the indemnity clause discussed in *Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28 (1975), limited liability when a party was negligent by violating its duty to a third party in crashing into a third-party driver.  *Id.* at 41.  Likewise, the damages clause in *United States v. Seckinger*, 397 U.S. 203 (1970), provided that a private contractor would be liable for damages arising out of its own negligence.  *Id.* at 204.  Its duties to its employees arose separately from the contract, but the "negligence clause" was still operative.  *Id.*  If English performed beneath the standard of care owed to VDOT, that would constitute negligence under these terms.

First, the contract expressly stated that English remained "ultimately responsible for the quality of the construction" even as it delegated specific tasks to its subcontractors. (Dkt. 14-2 at ECF 57). And English made the decision to change to the lower slab runners. Matthew Hackney, English's bridge superintendent, and Dylan Frazier, English's project manager, both recorded contemporaneous notes of their discussions with RK&K's Richard Clarke to make the switch to the lower slab runners. (Dkt. 55-11; Dkt. 55-21; dkt. 59-19 at ECF 7-8). And this was evident in the chain of command on the worksite: while all agreed that RK&K and CDM Smith could point out problems, the inspectors did not have the authority to engage in changes themselves. (Dkt. 59-5 at ECF 11; dkt. 55-4 at ECF 25-26). Any order to change the construction by the inspectors was *ultra vires* and should have been recognized as such by English employees. Ultimately it was someone from English, and not RK&K or CDM Smith, that was responsible for ordering and installing the new slab runners. (Dkt. 59-5 at ECF 12). And the parties all agree that it was these slab runners that led VDOT to reject the bridge.

English's main response is that while some people at English may have known, the right people did not. English downplays the role of Dylan Frazier, its project manager and future construction manager, as someone with merely secretarial functions. And it likewise minimizes the importance of its bridge superintendent and foremen both having contemporaneous knowledge of the change. The knowledge possessed by these individuals was imputable to English because they acquired it within the scope of their employment. *See Magco of Maryland, Inc. v. Barr*, 33 Va. App. 78, 84 (2000) ("Indeed, it is a longstanding principle in the Commonwealth that a foreman's knowledge of facts or events on a worksite is imputed to his employer."), *aff'd*, 262 Va. 1 (2001); *see also Employers Commercial Union Ins. Co. of Am. v. Great Am. Ins. Co.*, 214 Va. 410, 414 (1973); *Rudolph v. Farmers' Supply Co.*, 131 Va. 305, 108

S.E. 638, 640 (1921), *abrogated on other grounds by statute*. The most relevant case cited by English at argument is not to the contrary. In *Dimos v. Stowe*, 193 Va. 831 (1952), the Supreme Court of Virginia held that a repairman was not an agent for purposes of making a contract with his employer. *Id.* at 838. Compare that with this case, where Frazier worked on requests for design changes with AECOM. (Dkt. 55-4 at ECF 6, 21, 46). Frequently, he and Matthew Hackney were among the highest ranking English employees present on the bridge. Unlike the repairman in *Dimos*, changes to the structure of the bridge were clearly within the scope of Frazier's employment.

Second, this change was made without English seeking the approval of its design firm, AECOM. (Dkt. 55-4 at ECF 16-17). The contract specifically stated that English was required to get the approval of AECOM for all design changes. (Dkt. 55-3 at ECF 9, 12). This change involved a substitution to the steel support for the bridge. No parties now dispute that this significant change should have been sent to AECOM for approval (or, as would have occurred here, rejection). And no reasonable jury could disagree that this is the exact sort of change that AECOM was required to sign off on under the contract. But English did not ask AECOM to analyze whether this change would still fall within VDOT's specifications. If it had done so, AECOM would have told English that the change was impermissible, and the rejected bridge would never have been built. (Dkt. 55-17 at ECF 2-3). English was negligent, as that term is used in the contract, by failing to seek AECOM's approval.

Third and finally, English was informed of this error before it poured the concrete. Before the pour, RK&K double-checked the measurements between the slab runners and the concrete, and raised concerns about the spacing with English. (Dkt. 55-4 at ECF 33; dkt. 59-10 at ECF 17-20). Victor Niagro of CDM Smith submitted a written report to English describing

16

"several deficiencies" related to the spacing issues created by the steel reinforcement. (Dkt. 43-25). In addition to submitting this report, he discussed the issues with English's Foreman, Matthew Hackney. (*Id.*). Later, another CDM Smith inspector, Khairy Wahba, verbally raised the same concerns with English. (Dkt. 57-9 at ECF 11-13, 20-25). English communicated that it had cured these concerns to RK&K and CDM Smith before the concrete pour. (Dkt. 55-9 at ECF 11-12; dkt. 57-17; dkt. 59-24). There is no genuine dispute that English did not respond reasonably to these warnings. Instead of confirming that its change was in conformity with the design firm's approved plans, it moved ahead.

In light of this conduct, the term's of English's contract do not allow it to now seek contractual damages or indemnity from RK&K. English is not entitled to contractual damages from RK&K because its own "acts or omissions" caused its injury. (Dkt. 21-1 at ECF 20). These same acts or omissions demonstrate that RK&K did not "directly" cause those injuries. (*Id.*). RK&K had no authority to change the construction. Only English could order new supplies and command its own employees. In light of this undisputed evidence, and English's failure to get the change approved or heed its inspectors' warnings, English is also not entitled to indemnity. This is because of the clauses limiting indemnity when any damage is "caused by the negligence of" English and requiring RK&K to restore damages "[e]xcept if due to [English]'s negligence." (Dkt. 21-1 at ECF 20, 29. No genuine disputes of material facts prevent the Court from granting summary judgment for RK&K on the claims against it.[9]

---

[9]    RK&K briefly incorporated CDM Smith's argument about economic waste. (Dkt. 55 at ECF 22). Because I rule for RK&K based on other grounds, I do not address this argument.

I also will grant RK&K's motion for summary judgment on its counterclaim.[10]  Even after the change and English's knowledge of that change, RK&K continued providing quality assurance services to English under the contract.  English continued accepting those services, and paid for some of them.  However, it is undisputed that it later withheld some of the payments RK&K was entitled to for these services.  English did so as a setoff to the damages it believed it was owed.  RK&K's counterclaim asks for the payment of those services rendered.

Under Virginia law, "a party who has materially breached a contract is not entitled to recover damages for the other party's subsequent nonperformance of the contract."  *Horton v. Horton*, 254 Va. 111, 117 (1997).  "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract."  *Virginia Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 655 (4th Cir. 2017) (quoting *Horton*).  English argues that RK&K materially breached its contractual obligations through Clarke's involvement in the change and its failure to otherwise identify and document the change to the lower slab runners, and so it cannot now ask for payment.

However, *Horton* and related cases "do not stand for the conclusion that [a plaintiff's] breach bars it from suing [a defendant] for [the defendant's] subsequent breaches of contract *when both parties continued to perform under the contract*."  *Bayer Cropscience LP v. Albemarle Corp.*, 696 F. App'x 617, 623 (4th Cir. 2017) (emphasis added).  The defendant, or in this case the counterclaim defendant English, "may not keep the contract alive for his own benefit, claiming the royalties thereunder, and at the same time excuse his default by averring

_____

[10]    Both RK&K's and CDM Smith's counterclaims allege two counts. (Dkts. 14, 38).  In both counterclaims, the first count is for breach of contract, and is based on the unpaid fees discussed in the following paragraphs.  The second is for unjust enrichment, based on the work performed without receiving the above fees.  Because I grant judgment for the defendants on the breach of contract claims, I deny their alternative equitable claims.  *See Inman v. Klockner-Pentaplast of Am., Inc.*, 467 F. Supp. 2d 642, 655 (W.D. Va. 2006).

that the contract was at an end. He may not in the same breath affirm and disaffirm." *Id.* (quoting *Am. Chlorophyll v. Schertz*, 176 Va. 362, 11 S.E.2d 625, 628 (1940)).

So assuming that RK&K did breach, English was not entitled to continue utilizing RK&K's services and then refuse to pay for those services. English has admitted that the amount of RK&K's unpaid balance is $148,805. (Dkt. 55-22 at ECF 4). And because RK&K was not liable to English for any damages, English was not entitled to offset any of the fees it owed RK&K. RK&K is entitled to summary judgment on that unpaid balance.

RK&K additionally asks the Court for prejudgment interest on that unpaid balance. "Virginia law governs the award of prejudgment interest in a diversity case." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999). "Whether prejudgment interest should be awarded . . . is a matter within the sound discretion of the district court." *Id.* Under Virginia law, "[i]n any . . . action at law or suit in equity . . . the final order . . . may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va. Code § 8.01–382. Based on the facts of this case, RK&K will be awarded prejudgment interest "to compensate [RK&K] for the loss sustained by not receiving the amount to which [it] was entitled at the time [it] was entitled to receive it . . . ." *Marks v. Sanzo*, 231 Va. 350, 356 (1986); *c.f. BioVeris Corp. v. Wohlstadter*, 69 F. Supp. 3d 574, 581 (W.D. Va. 2014). However, the briefing does not address when this interest should start accruing or at what rate it should accrue. *See* dkt. 55 at ECF 26 ("It is unclear when VDOT paid English for their corresponding invoices . . . ."). Accordingly, while RK&K is entitled to prejudgment interest, the parties are directed to file further briefing on this issue.

Finally, RK&K also asks for post-judgment interest. "Federal law, rather than state law, governs the calculation of post-judgment interest in diversity cases." *Signet Bank*, 166 F.3d at

633.  Under 28 U.S.C. § 1961, RK&K will be entitled to compounding postjudgment interest running from the date of this judgment until payment "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." *See also Hylind v. Xerox Corp.*, 632 F. App'x 114, 116 (4th Cir. 2015).

## IV. DISCUSSION OF CDM SMITH'S MOTION FOR SUMMARY JUDGMENT

English made out identical contract (Count III) and indemnity (Count IV) claims against CDM Smith.  Likewise, CDM Smith counterclaimed for its unpaid invoices.  However, CDM Smith and English had different terms in their contract than RK&K and English, and so I address CDM Smith's and English's dispute separately.

### A.  What were CDM Smith's contractual obligations?

Unlike RK&K, CDM Smith did not include its own terms sheet and it did not handwrite in the same terms used by RK&K.  The terms of the "Indemnity" portion of its contract state:

> Subcontractor agrees to defend, indemnify and save harmless Contractor . . . against any claim . . . attributable to [damages] caused by, arising out of, resulting from, or occurring in connection with the performance of the Work of the Subcontractor . . . provided, however, Subcontractor's duty hereunder shall not arise if such injury, sickness, death, damage, or destruction is caused by the *sole* negligence of a party indemnified hereunder. . . .

> Should Owner . . . assert a claim . . . against Contractor involving the manner or sufficiency of the performance of the Work, . . . Subcontractor shall indemnify and save harmless Contractor . . . from and against any liability, loss, damage, or expense arising out of or relate [*sic*] to such claim, suit, action, or proceeding.

(Dkt. 43-5 at ECF 6) (emphasis added).  Additionally, its contract contains a "Damages" paragraph that states:

> Contractor shall not be liable or responsible for any loss or damage to the Work, and Subcontractor shall be responsible for the correction or restoration of any such loss or damage to the Work, or to the work of Contractor or any other subcontractor, resulting from the operations of Subcontractor, or its subcontractors, agents, servants or employees hereunder.

20

(*Id.* at ECF 8).

So CDM Smith's contractual duty to indemnify English does "not arise if such [damage] is caused by the sole negligence of" English. (Dkt. 43-5 at ECF 6; dkt. 66 at ECF 6 ("The overarching question for this Court is whether a reasonable jury could find that English's damages resulted from some cause *other* than its own negligence.")). Likewise, CDM Smith does not owe contractual damages to English unless English's injuries are "resulting from the operations of [CDM Smith]." The parties seem to agree on this standard, but they predictably disagree on whether English's injuries arose out of its sole negligence, or whether they also arose out of some negligence on CDM Smith's part.

As with RK&K, the concepts of negligence and causation tie into the parties' contractual responsibilities. While RK&K's motion could be resolved on the basis of English's failure to follow its contractual obligations, CDM Smith's cannot. CDM Smith must demonstrate that no reasonable jury could find that it was negligent in light of its contractual obligations. However, the parties dispute exactly what CDM Smith's contractual obligations are, specifically as they pertain to the inspection of non-conformities.

The contract laid out a specific plan for addressing non-conformities. (Dkt. 14-2 at ECF 66). As summarized above, there are generally three levels of non-conformities. At the hearing, CDM Smith argued that the slab runner would be a Level One or Level Two non-conformity, while English argued that it would fall into Level Two. I agree with English that this would be a Level Two issue because Level One issues must be "identified and corrected [on the] same day." (*Id.*). The slab runner issue would require a longer time frame to correct and approve. For Level Two issues, CDM Smith was required to notify an English foreman, note the issue in its diary, and turn the issue over to RK&K. (*Id.*). RK&K then would take the lead, although both RK&K

and CDM Smith were to reinspect before RK&K allowed English to receive payment from VDOT. (*Id.*).

Level Three only arises when VDOT's approval is required because the parties cannot come to an agreement on how to resolve issues or deficiencies. (Dkt. 14-2 at ECF 66; *id.* at ECF 144 ("If the issues or deficiencies cannot be resolved, the inspector will advise [RK&K] and initiate a Non-Conformance Report (NCR).")). Importantly, these issues, unlike the previous levels, "require[] input from upper level management from the Design-build team, such as the Design Manager." (*Id.* at ECF 66).

In addition to this detailed framework for dispute resolution, the contract contains more general statements that CDM Smith is to "[r]eport any quality deficiencies to the [construction manager] . . . ." (Dkt. 14-2 at ECF 142-44). These statements are in tension with the framework's statement that Level One and Level Two non-conformities should be addressed to English's Foreman. Likewise, one of these more general paragraphs states: "Nonconformance reports will be issued and logged for all non-conforming work." (*Id.* at ECF 142). This appears to contradict the framework's statement that non-conformance reports need only be issued for Level Three non-conformities.

Under Virginia law, the specific / general canon provides that "general words are limited and qualified by the specific words and will be construed to embrace only objects similar in nature to those objects identified by the specific words." *Covel v. Town of Vienna*, 280 Va. 151, 161–62 (2010). This canon provides a familiar tool to interpret contracts and statutes, and Virginia courts apply it identically in both the contractual and statutory contexts. *See, e.g., Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 573 (2011) ("[A] specific provision of a contract governs over one that is more general in nature.");

*Gas Mart Corp. v. Bd. of Sup'rs of Loudoun Cty.*, 269 Va. 334, 350, 611 S.E.2d 340, 348 (2005) ("[W]hen one statute speaks to a subject generally and another deals with an element of that subject specifically, the statutes will be harmonized, if possible, and if they conflict, the more specific statute prevails."). The rationale of the canon is not to eliminate or read away the general terms, but to find a way to allow the more specific terms to exist side-by-side the more general. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("To eliminate the contradiction, the specific provision is construed as an exception to the general one."). Of course, "the general/specific canon is not an absolute rule," and it "can be overcome by textual indications that point in the other direction." *Id.* at 646-47.

Taking the contract as a whole, the more specific framework governs Level One and Level Two non-conformities. The more general requirements should be read as only applying to Level Three non-conformities. The general requirement of reporting to the construction manager, (dkt. 14-2 at ECF 142-44), then corresponds with Level Three's specific mandate to receive "input from upper level management from the Design-build team . . . ." (Dkt. 14-2 at ECF 66). The contract does not anticipate that all issues, even minor ones, must be reported to English's construction manager, and so this application of the specific / general canon makes the most sense of the contractual terms. (*Id.* at ECF 66).

Elsewhere, other general language requires "[n]onconformance reports . . . for all nonconforming work." (Dkt. 14-2 at ECF 142). But a few pages later, the plan only envisions these reports "[i]f the issues or deficiencies cannot be resolved as necessary . . . ." (*Id.* at ECF 144). This tension is likewise ameliorated by reading these sentences in light of the more specific framework's guidance that nonconformance reports are only required for the most serious issues. The contract does not require full blown non-conformance reports for simple

issues that can be fixed immediately by the foreman on site. (*Id.* at ECF 66). The specific / general canon leads to these common sense readings that make sense of all of the language, not merely the parts that support English. *See First Am. Bank of Virginia*, 259 Va. at 69.

Accordingly, the more specific reporting framework governs the parties' obligations with respect to Level One and Two non-conformities, while the more general language should be read to apply to Level Three non-conformities. With this understanding of the contract, I move on to consider whether CDM Smith is entitled to summary judgment under those terms.

## B. Did CDM Smith fulfill those obligations?

CDM Smith is entitled to summary judgment because a reasonable jury would be required to find that it fulfilled its contractual obligations, and English's damages arose out of its sole negligence. CDM Smith contracted to "provide inspection and testing to assess construction processes relative to the applicable standards and specifications." (Dkt. 14-2 at ECF 140). It was the lowest level inspector, and was required to loop in other final decision makers as issues escalated. (*Id.* at ECF 66). It had no direct control over English's construction means or methods. (Dkt. 43-6 at ECF 17). And, unlike RK&K, CDM Smith had no ability to threaten to withhold payment to stop the pour. Instead, it had various obligations to perform testing and pass the results up the chain of command.

CDM Smith fulfilled its material obligations. I work through its interactions with English's decision to install the lower slab runners chronologically. CDM Smith was not a party to the initial conversation memorialized by English's bridge superintendent and project manager where the decision to switch to the shorter slab runners was made. (Dkt. 43-7 at ECF 17). After it learned of English's and RK&K's decision to make this change, a CDM Smith inspector, Khairy Wahba, informed construction workers about the decision to switch to the lower slab

runners and referred follow-up questions about the change to Richard Clarke, the head of RK&K's team. (Dkt. 62-3 at ECF 6-9; dkt. 62-4 at ECF 1-2).[11] English's foreman testified that Clarke then discussed the issue again with Matthew Hackney, English's bridge superintendent. (Dkt. 62-3 at ECF 9). This reporting up the chain worked as it was supposed to—the questions flowed to the senior inspector and the contractor.

Once the new steel reinforcement was installed, Victor Niagro, another CDM Smith inspector, provided both written and oral notification to English of the spacing problem. (Dkt. 43-25; Dkt. 62-5 at ECF 6, 11-12, 19; dkt. 57-10 at ECF 6-9, 11-13). When CDM Smith's measurements demonstrated that the bridge was not in conformity, it did what it was supposed to do under the contract. CDM Smith's identification of this change also satisfied its responsibilities as part of the "change process." Remember, for Level Two non-conformities like this, CDM Smith employees were required to notify an English foreman, note the issue in their diary, and work with RK&K on the issue. (Dkt. 14-2 at ECF 66). Niagro's daily report provided the written memorialization of the issue. (Dkt. 43-25). He also discussed the issues he found with English's foreman. (*Id.*). Niagro, in his deposition, also testified that he reported the issue to his superior, Khairy Wahba, who raised the issue with RK&K. (Dkt. 57-10 at ECF 5-6, 12-13). Under the contract, RK&K was then to take the lead, as it was only RK&K that could determine whether to warn VDOT to refuse payment to English. (Dkt. 14-2 at ECF 66). CDM Smith was required to reinspect the non-conformity with RK&K. (*Id.*). It did so, three days later on April 24, 2012. (Dkt. 43-39 at ECF 12).

---

[11]     CDM Smith argues that Jehugh Crouch's afficavit, (dkt. 62-4), contains inadmissible hearsay. However, these statements were made by a party opponent within the scope of his employment, and so I consider the affidavit. *See* Fed. R. Evid. 801(d)(2)(D).

On that day, Khairy Wahba of CDM Smith verbally told English and RK&K that the concrete cover was greater than the tolerance approved in the AECOM drawings. (Dkt. 57-9 at ECF 11-13, 20-25). Wahba also recorded the nonconforming measurements and showed them to Hackney, of English, and Clarke, of RK&K. (*Id.*). These written measurements were submitted. (Dkt. 43-16 at ECF 19-20; dkt. 57-14). Clarke said that the change was okay, and then English proceeded with the pour over the steel reinforcement. CDM Smith both believed the concern had been cured and furthermore had no power to stop the pour. In its daily report and checklist, CDM Smith recorded the issue and noted that English and RK&K were satisfied by the corrections that had been made. (Dkt. 57-17). After English and RK&K had verified the change met their standards, CDM Smith marked the steel reinforcement as being in conformity. (*Id.*). CDM Smith followed its contractual obligations to notify English and RK&K of the results of its measurements.

English's main complaint is that CDM Smith did not do more to stop the pour. But CDM Smith followed the procedures set out for Level Two nonconformities. English cannot now complain that it did not perform these procedures again and again until English decided to pay attention. The procedures set out a specific process to achieve a specific goal: a set of escalating reporting requirements ensured English and RK&K knew the status of the bridge before the pour. These procedures succeeded: English acquired knowledge through Frazier's and Hackney's awareness of the change. These two men were, after all, among the highest ranking English employees at the pour. The only problem, however, was that English's employees made the decision to move forward with the pour. A reasonable jury would be required to find that English's injuries arose out of its own negligence, actions, and omissions, and not CDM Smith's.

It is also important to remember that CDM Smith reported to both RK&K and English. It was the junior inspector on this project. A contractual arrangement that leaves the junior party holding the bag for two sophisticated senior parties gives the Court pause. This is not necessarily because such a scheme would be unfair, parties are of course free to contract away their liability as they see fit, but instead because it seems unlikely that the parties would actually intend this result. Other courts agree.

For example, in *Daniel Const. Co. v. Welch Contracting Corp.*, 335 F. Supp. 303 (E.D. Va. 1971), a general contractor moved for indemnification from its subcontractor when the sides of an excavated site collapsed. *Id.* at 304. The parties' contract required the subcontractor to indemnify the contractor for liability arising out of the subcontractor's work, even when arising out of the contractor's acts or omissions. *Id.* The court interpreted the indemnity clause to "be binding on [the subcontractor] only if the claim arose out of [the subcontractor's] work." *Id.* at 306. The court thought Virginia law would not countenance a broader reading, requiring indemnity for "any and all liability without reference to cause or the indemnitor's work." *Id.* at 305. This was because "[the contractor]'s claim is not a situation where the contractor was unaware of certain work being done by a subcontractor, or even simply allowed such work to be done. Instead it is clearly indicated that the work in question was under the actual direction and control of [the contractor]." *Id.* at 308. The court held that the contractor's desired "result from an indemnity clause as worded here would prove contrary to the intent of the parties involved in the construction contract, bearing in mind that [the contractor] drafted the contract. Hence, the loss must be suffered by [the contractor] alone." *Id.* at 308.

Likewise, the language of the contract and the evidence of the parties' intent will not bear the reading English puts forward. CDM Smith performed its contractual obligations. English's

injury arose out of its sole negligence, acts, and omissions. Accordingly, I will grant CDM Smith's motion for summary judgment on English's claims.[12]

Additionally, CDM Smith is entitled to summary judgment on its counterclaim. Like RK&K, CDM Smith continued providing services to English under the contract. Also like the services rendered by RK&K, English continued accepting those services and paid for some of them. English then withheld the final payments CDM Smith was entitled to for these services. CDM Smith's counterclaim asks for the payment of those services rendered. As I have described above, CDM Smith did not materially breach its contract with English. *Bransen Energy, Inc.*, 850 F.3d 645, 655 (4th Cir. 2017) ("A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." (quoting *Horton*)). It is undisputed that CDM Smith has an unpaid balance of $329,660 for services rendered. (Dkt. 43-11 at ECF 13). And because CDM Smith was not liable to English for any damages, English was not entitled to offset any of the fees it owed CDM Smith. CDM Smith is entitled to summary judgment on that sum.

CDM Smith also asks for prejudgment interest. However, like RK&K, it has not demonstrated when this interest should run from. It claims that prejudgment interest should run from January 17, 2014. In support of this, it cites a letter that it sent to English on that date. (Dkt. 43-1 at ECF 27 (citing dkt. 43-14)). The Court has reviewed the letter cited, but CDM Smith has not sufficiently explained the significance of the letter or why prejudgment interest should begin to run from the date of the letter. Accordingly, while I will grant CDM Smith prejudgment interest for the same reasons I grant it to RK&K, I will also direct further briefing

---

[12]     As with RK&K, because I rule for CDM Smith on other grounds, I do not reach CDM Smith's arguments related to economic waste.

on the date this interest should begin accruing and the rate at which it should accrue. Finally, CDM Smith will also be entitled to post-judgment interest under 28 U.S.C. § 1961.

## VI. CONCLUSION

None of the material facts are in the dispute; the question before the Court is simply whether RK&K and CDM Smith are liable to English based on those facts under their respective contracts. For different reasons, neither defendant is liable. RK&K is not liable because its contract excused it from damages and the duty to indemnify when the injury arose from English's negligence, acts, and omissions. CDM Smith is not liable to English because it performed its contractual obligations. Finally, both RK&K and CDM Smith are entitled to their unpaid fees retained by English, although further briefing is directed on the issue of prejudgment interest. Accordingly, I will grant RK&K's and CDM Smith's motions for summary judgment and deny English's.

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this __6th__ day of March 2018.

_Norman K. Moon_
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE