CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

2/3/2020

JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |
|---|---|
| W.C. ENGLISH, INC., | CASE NO. 6:17-CV-00018 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| RUMMEL, KLEPPER & KAHL, LLP, *et al.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

This matter is before the Court on the parties' seven motions *in limine* submitted in advance of trial, specifically Defendants Rummel, Klepper & Kahl, LLP's ("RK&K") and CDM Smith, Inc.'s ("CDM Smith") motions:

(1) to preclude evidence of English's alleged repair damages (Dkt. 93);

(2) to preclude evidence of English's delay damages (Dkt. 82);

(3) to preclude and/or limit certain English witnesses from testifying at trial (Dkt. 87); and

(4) to preclude evidence at trial concerning Defendants' alleged directive to use shorter slab runners (Dkt. 91) (submitted solely by RK&K);

and Plaintiff W.C. English, Inc.'s ("English") motions:[1]

(1) to exclude CDM Smith's expert Robert Scheller (Dkt. 46);

(2) to exclude RK&K's expert William Sibert (Dkt. 48); and

(3) to exclude the AECOM subcontract (Dkt. 96).

As the facts of this dispute were recounted in detail by the Court in its decision awarding summary judgment to Defendants—and the Fourth Circuit's subsequent opinion vacating that decision—they will not be repeated here. *W.C. English, Inc. v. Rummel, Klepper & Kahl, LLP,*

---

[1] English also submitted a motion *in limine* to Exclude Fall Hill Avenue Widening Proposal to VDOT, Dkt. 97, but later withdrew it. Dkt. 140.

No. 6:17-cv-00018, 2018 WL 1177358, (W.D. Va. Mar. 6, 2018), *vacated and remanded*, 934 F.3d 398 (4th Cir. 2019).

## I. MOTIONS TO EXCLUDE

English moves to exclude CDM Smith's expert Robert Scheller, Dkt. 46, and RK&K's expert William Sibert, Dkt. 48. The Court will exclude Sibert's testimony and exclude certain portions of Scheller's.[2]

### Legal Standard

An expert qualified "by knowledge, skill, experience, training, or education, may testify" as to scientific, technical, or other specialized knowledge if it will assist the trier of fact. Fed. R. Evid. 702. However, such testimony is only admissible if (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94 (1993).

The Court's consideration of these factors is "to 'ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597) (alterations omitted). If the expert meets this threshold, criticisms of his testimony will go to its weight, not its admissibility. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195–96 (4th Cir. 2017).

---

[2] Unlike the other motions addressed in this opinion, these two motions to exclude were heard by the Court on January 30, 2018, prior to the Court's Summary Judgment opinion, Dkt. 99, and the Fourth Circuit's subsequent remand. *W. C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 399 (4th Cir. 2019).

1. **English's Motion to Exclude Robert Scheller**

English has moved to exclude CDM Smith's expert Robert Scheller. Dkt. 47. Scheller has proffered four opinions: (1) CDM Smith met its standard of care for quality control; (2) English replaced the bridge deck despite expert findings that it was within acceptable tolerances; (3) English continued to employ CDM Smith as a quality control subcontractor after English learned of the alleged non-conformity with the bridge; and (4) other factors contribute to spacing of reinforcing steel location. Dkt. 47 at 5.

English first claims that Scheller has insufficient "knowledge, skill, experience, training, or education" to testify. Dkt. 47 at 5–6. English focuses on Scheller's lack of experience with quality assurance and quality control on VDOT projects. *Id.* But this lens is too narrow; Scheller has worked on a number of similar public projects (such as a federal courthouse, metro buildings, public schools, and prisons) and his experience could be helpful to the trier of fact. English also focuses on the fact that Scheller is a civil geotechnical engineer, instead of a civil structural engineer. Dkt. 71 at 5. While it is true that his education or training may not, without more, qualify him as an expert, the above-referenced experience with similar projects is what qualifies Scheller as an expert. English's argument to disqualify Scheller based on lack of experience fails.

English also objects that Scheller's second opinion is entirely based on his reading of engineering reports produced by English during its dispute with VDOT about whether it needed to replace the bridge. Dkt. 47 at 8–9. The opinion is not based on any independent analysis, and so English argues that a lay jury will be equally qualified to review these reports and the contract to determine whether English was required to tear down the bridge. *Id*. Furthermore, English objects that Scheller's opinions on economic waste are legal conclusions. Dkt. 47 at 9. It appears that Scheller purports to testify that, based on his experience, it would be "economic waste" to tear

down the bridge. I agree with English on both grounds and find this proffered testimony would impermissibly testify as to a legal conclusion. Accordingly, Scheller's second opinion—that English replaced the bridge deck despite expert findings that it was within acceptable tolerances— shall be excluded. *See United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) ("We identify improper legal conclusions by determining whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." (internal citations omitted)); *SunTrust Banks, Inc. v. Robertson*, No. 2:09-cv-197, 2010 WL 11566593, at *5 (E.D. Va. Aug. 12, 2010) ("[T]he inadmissibility of legal conclusions is well-established.").

English further objects to Scheller's third opinion: that English's decision not to terminate CDM Smith's and RK&K's contracts demonstrates that it was satisfied with their work. Dkt. 47 at 10–11. I find this purported expert testimony is a problematic combination of speculation and legal conclusions. *See, e.g.*, *McIver*, 470 F.3d at 562 ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying laws to the facts is generally inadmissible."). And the helpfulness of such testimony to a jury is questionable at best. As a result, any probative value of such testimony is substantially outweighed by its likelihood to mislead the jury. Fed. R. Evid. 403. Thus, the Court will exclude it.

Finally, English objects that Scheller should have reviewed more information and that his opinion was speculative. Dkt. 47 at 9–10. In this case, Scheller reviewed the pertinent parts of the record, and so any concerns that he should have reviewed more or different documents are, for the most part, more appropriately addressed through cross-examination. However, parts of his opinion are indeed speculative: he testifies, for example, that the reinforced steel mats could have been compressed by construction workers walking on them. Dkt. 71 at 7. Neither of the parties make

this argument; there is agreement the problem in the construction came from the decision to move to shorter slab runners. Therefore, Scheller's fourth opinion will be excluded as well.

English's motion will be **GRANTED** as to Scheller's second, third, and fourth opinions but **DENIED** as to Scheller's first opinion. Dkt. 46.

### 2. English's Motion to Exclude William Sibert

English also moves to exclude RK&K's expert, William Sibert. Dkt. 51. Sibert's testimony concerns the standard of care English owed to VDOT. *Id.* at 3. Sibert had been a VDOT inspector on multiple bridges over I-81, and he has served as an instructor for other VDOT inspectors. He also has had a long career running a large-scale construction company. Dkt. 68 at 3.

English objects that Sibert's testimony about the standard of care boils down to saying that the parties are supposed to follow the contractual documents. There is no dispute that the standard of care for all of the parties is set by the contracts, and so English argues that this will not be helpful. Dkt. 51 at 8–10. I agree. Equally problematic is the fact that much of Sibert's testimony amounts to little more than legal conclusions made after reviewing the evidence. Dkt. 51-4 at 5–7. For example, he discusses deposition testimony, construes the contracts, and makes conclusions about whether English acted negligently. *Id.* The jury is fully capable of evaluating all this information to reach its own conclusions; expert testimony would not be helpful or necessary here.

In sum, Sibert's testimony shall be excluded because it largely consists of his interpretation and recitation of specific parts of the factual record that a jury would be equally qualified to evaluate. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) ("And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded."); *Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 735 (W.D. Va. 2000) ("Expert testimony with a greater potential to

mislead than to aid the jury should be excluded."). English's motion to exclude Sibert will be

**GRANTED**. Dkt. 50.

## II. MOTION TO PRECLUDE EVIDENCE AT TRIAL CONCERNING THE DEFENDANTS' ALLEGED DIRECTIVE TO USE SHORTER SLAB RUNNERS

Next, RK&K moves the Court *in limine* to preclude English from introducing any evidence

that RK&K's Quality Assurance Manager Richard Clarke "directed, authorized or approved"

English personnel to use 1 ¾" slab runners rather than the 2 ½" slab runners that the contract

required. Dkt. 91. This deviation in slab runner size—however it came to occur—is ultimately

what caused VDOT to order the bridge rebuilt. *W. C. English, Inc.*, 934 F.3d at 399 (4th Cir. 2019).

RK&K argues that it is "not seeking to prohibit the introduction of all evidence concerning

RK&K's purported knowledge of bridge deck noncomformities. But the jury should not hear the

'directive' evidence where English has admitted, time and again, that it knew RK&K could not

direct English to deviate from the parties' contractual requirements or instruct English to change

the design of B603's plans and specifications." Dkt. 136 at 3.

RK&K asserts that the following statement, appearing in English's brief supporting its

partial motion for summary judgment, is an admission that any such directive is irrelevant for any

purpose in this case:

> English maintains that it used this dimension slab runner at the direction of
> RK&K (*see* Exhibit 15, pp. 160:16-169:1; 170:10-171:22; 171:13-173:6;
> Exhibit 16), with the knowledge of CDM Smith, and that CDM Smith and
> RK&K stopped English when it first installed the 2 ½ inch slab runner,
> causing English to rework a significant portion of the deck. *See* Exhibit 17,
> pp. 18:1-21:4; 42:11-43:3; 44:19-45:17. RK&K apparently disputes this
> fact, however, how English came to use the 1 ¾ inch slab runner is irrelevant
> to whether RK&K properly performed its inspections and documentation
> requirements under the QA Plan.

Dkt. 59 at 8 n.1. I do not take English's language in this regard as any such admission. Placed in the context of the summary judgment posture, English was clearly stating that for it to prevail on its summary judgment motion against RK&K, it was not necessary for the Court to resolve whether RK&K directed English to use the 1 ¾ inch slab runner. English's argument on summary judgment rested not on establishing that RK&K directed or had the authority to direct the use of the shorter slab runners, but on establishing that RK&K knew of the nonconforming rebar spacing and failed to fulfill its QA duties in light of it. English agrees that it is not necessary to its case to show that RK&K's agent directed English to make the slab runner error, but that does not mean that such evidence is irrelevant. To the contrary, evidence that an RK&K agent directed the change would surely be probative of whether he at least had knowledge the change was being made. Dkt. 134 at 6. As a result, such evidence is relevant to English's claim that RK&K was negligent in allowing such a change.

However, relevance does not equate to admissibility. Federal Rule of Evidence 403 states that evidence should not be admitted when its probative value is substantially outweighed by a risk of undue prejudice or confusion of the issues. While there is some discernible risk that allowing such evidence will muddle the issue of whether RK&K breached its contract with English, such risk does not substantially outweigh the probative value of such testimony. Thus, RK&K's motion to preclude evidence at trial concerning the Defendants' alleged directive to use shorter slab runners shall be **DENIED**. Dkt. 91.

### III. MOTION TO PRECLUDE AND/OR LIMIT CERTAIN ENGLISH WITNESSES FROM TESTIFYING AT TRIAL

The parties filed pretrial witness lists on February 26, 2018, wherein English identified nineteen witnesses whom it may call at trial. Dkts. 81, 84, 85. The Defendants' joint motion seeks

to exclude or limit the testimony of four of these nineteen witnesses: 1) Gary Galloway, 2) Matthew Hackney, 3) Jehugh Crouch, and 4) Bernard Davis. The parties resolved the issue with respect to Hackney at a hearing before the Court on these motions, Dkt. 141; the motion shall be **DENIED** with respect to the other three Defendants.

## 1. Gary Galloway

Defendants object to Gary Galloway for two reasons. First, they argue that English failed in its witness disclosure obligations with respect to Galloway. Second, Defendants argue that Galloway's testimony is not material to any dispute of fact.

### i. English's failure to disclose Galloway

Rule 26 requires a party to provide initial disclosures of "the name, and if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). When a disclosing party learns that the disclosure is incomplete, it has a duty to supplement whenever "the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). The Advisory Committee notes for Rule 26 indicate that this exception to the duty to supplement disclosure includes situations "when a witness not previously disclosed is identified during the taking of a deposition . . . ." Fed. R. Civ. P. 26 advisory committee's note; *see also Quesenberry v. Volvo Grp. N. Am., Inc.*, 267 F.R.D. 475, 477 (W.D. Va. 2010) (Jones, J.).

Rule 37(c)(1) identifies the sanctions for a failure to disclose or properly supplement a disclosure: "If a party fails to provide information or identify a witness as required by Rule

26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37. The party who has failed to make the disclosure carries the burden of demonstrating harmlessness or substantial justification. *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003). In order to determine whether the failure to disclose was substantially justified or harmless, the Court, in exercise of its broad discretion in such decisions, should consider what have become known as the *Southern States* factors:

> (1) The surprise to the party against whom the evidence could be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence."

*Id.* at 597. The Fourth Circuit has since explained, however, that courts need not "tick through each of the *Southern States* factors" in making this decision. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

Defendants argue that English failed to disclose Galloway as a witness until after the close of discovery, to Defendants' unfair surprise. English failed to include him in its Initial Disclosures on May 24, 2017, and its supplemented Initial Disclosures on December 7, 2017, Dkt. 88 at 5 (citing Dkts. 43-11 & 83-4), first noting him in writing as a person of interest in the case on December 17, 2017, in its motion for summary judgment. They conclude that English's failure to disclose Galloway was not substantially justified, because English had several opportunities to do so between May 2017 and December 2017. As a result, Defendants claim that they were not able to identify Galloway as a person of interest in the case until after the close of discovery.

Galloway was not initially disclosed, English claims, because he was not involved in the decisions to change the rebar spacing of the bridge or to allow the concrete pour of the bridge deck

to go forward—thus, English concludes they were substantially justified in not disclosing him. English contends the omission is harmless, because there is now substantial time to re-open discovery, and English has already offered its consent to Defendants to depose Galloway. Further, English indicates it has updated its initial disclosures to include Galloway. Dkt. 126 at 7.

English claims that all parties knew Galloway was English's Construction Manager for this project "during the operative events at issue in April 2012," and so it should be no surprise that Galloway could be called as a witness at trial. RK&K identified him as much in its initial disclosures, and English argues that "[a]ll parties testified to this fact during the depositions." As evidence, English cites to depositions from Khairy Wahba (CDM Smith's inspector), Richard Clarke (RK&K's Quality Assurance Manager), Wilson Dickerson, a Senior Vice President for English), and Bernard Davis (a Design-Build Project Manager for English), which all indicate that Gary Galloway was English's design construction manager for the I-81 bridge construction.

English has the better argument. Although it failed to disclose Galloway initially, he was made known to Defendants at several points during the discovery process throughout multiple witness depositions. Fed. R. Civ. P. 26(e) advisory committee's note. As made relevant in *Southern States*, there is little surprise Galloway would be called as a witness, and any surprise could be cured by deposing Galloway, to which English has already consented. *S. States Rack & Fixture, Inc.*, 318 F.3d at 596.

ii.  Materiality of Galloway's testimony

Defendants also object to Galloway's testimony for two other reasons: (1) English cannot establish the necessary factual basis to make Galloway's testimony relevant and (2) even if this factual basis can be established, his testimony is not material to any issue in dispute.

Under English's theory of the case, CDM Smith failed to perform its obligation under its subcontract with English to notify English's construction manager "if deficiencies were not resolved and materials or workmanship did not comply with the specifications for the project." Dkt. 126 at 3. Galloway is expected to testify that, as construction manager during the operative time period, he never received this notification from CDM Smith. *Id.*

Defendants contend that Galloway is not a relevant witness to the case, because there is little evidence to show he actually was the project's construction manager during the relevant time period. They state that he was not identified in the Quality Assurance and Quality Control ("QA/QC") plan as "a relevant agent of English in relation to quality assurance or quality control" and apparently had retired from English before Stage I Construction of B603, Dkt. 88 at 8 (citing Dkt. 43-6, Testimony of English 102:09-102:21), being replaced by Dylan Frazier as construction manager on the project by that time. Dkt. 88 at 9 (citing Dkt. 43-6, Testimony of English 102:09-102:21).

Galloway's relevance as a witness does in fact depend on him being the project's construction manager during the operative events in April 2012, and there is indeed a genuine question as to when Frazier replaced Galloway as construction manager.[3] However, the Court need not resolve this question definitively in order to admit Galloway's testimony. Federal Rule of Evidence 104(b) provides that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." But "in

---

[3] Khairy Wahba, CDM Smith's agent, says Galloway was "maybe" the construction manager on the project. Dkt. 126-5. RK&K's Quality Assurance Manager Richard Clarke and English employee Bernard Davis named Galloway as the construction manager, but they did not say when Frazier took over for him. Dkts. 126-2; 126-4. In the deposition testimony cited by English, only Wilson Dickerson, senior vice president at English, stated that Galloway was the construction manager during the relevant period. Dkt. 126-3; *see also* Dkt. 99 at 4.

determining whether [a party] has introduced sufficient evidence to meet Rule 104(b)," the Court must "simply examine[] all the evidence in the case and decide[] whether the jury could reasonably find the conditional fact"—in this case, whether Galloway was in fact the construction manager at the operative time—"by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988). That threshold is met here.

Defendants also argue that, even if Galloway was construction manager at the relevant time, he cannot testify to any material issue in this case. First, they contend that Galloway has no personal knowledge of any issue in dispute, stating that "English now acknowledges that Mr. Galloway has no personal knowledge of English's decision to change the spacing between concrete rebar for Bridge 603, or Mr. Hackney's subsequent decision to allow the concrete pour to move forward in the face of warnings from Defendants," Dkt. 132 at 2–3. Second, Defendants argue that "English does not need Mr. Galloway to establish the negative, i.e., that he was not advised of the pre-pour defects in the bridge rebar," because several of Defendants' witnesses—namely Clarke and Wahba—can testify to this fact on cross examination. *Id.*

First, it may well be true that Galloway has no personal knowledge of the decision to change the rebar spacing or allow the concrete pour, but this does not bear on his ability to testify to the discrete question of whether he was given notice by Wahba or Clarke pursuant to the QA/QC plan. Dkt. 126 at 3. Should English seek to elicit testimony from Galloway beyond this narrow issue, Defendants may renew their objection that Galloway lacks the requisite personal knowledge.

Defendants' second argument is in effect a Rule 403 objection. They claim that any probative value in Galloway's testimony will be outweighed by a waste of the jury's time because the need for Galloway's testimony could be supplanted by other evidence—namely the testimony of Defendants' own witnesses, Clarke and Wahba. But this provides grounds for exclusion only if

the probative value of Galloway's testimony is substantially outweighed by the factors counseling against admission. Fed. R. Evid. 403. Galloway's testimony is sufficiently probative to defeat this challenge, and English is entitled to put on its own witnesses to establish this fact for a jury, without relying on the witnesses of its adversaries. Defendants' second argument fails as well.

As Defendants' objections to Galloway's testimony are without merit, their motion shall be denied as it relates to Galloway.

### 2. Matthew Hackney

To resolve Defendants' motion with respect to Matthew Hackney, the parties have agreed that Defendants may depose Hackney prior to trial. The parties have been instructed to begin scheduling the deposition, and any further issues regarding this deposition—including who shall bear the cost of it—shall be decided by U.S. Magistrate Judge Robert S. Ballou.

### 3. Jehugh Crouch

English offers the testimony of Jehugh Crouch as evidence that CDM Smith's agent Khairy Wahba instructed Crouch and his team that they were using "the wrong height slab runners" and that RK&K's Quality Assurance Manager Richard Clarke also told Crouch and his team that they were using slab runners of incorrect height. Defendants first argue that Crouch's expected testimony is not relevant to any issue in dispute for the same reason RK&K sought to preclude testimony that Clarke directed the use of the improperly sized slab runners in the previously discussed motion, Dkt. 91, which this Court rejected. *See supra* Part III.

Defendants also argue that Crouch lacks personal knowledge about any material events that occurred prior to April 24, 2012, for the following reasons: 1) Crouch was not identified as someone with personal knowledge of the "relevant meetings, discussions, dry runs, wet runs inspections, or notices" in any of English's responses to Defendants' interrogatories, Dkt. 43-12,

p. 3; 2) the record shows that Anderson Jeffries, not Crouch, was the foreman responsible for overseeing the installation of the reinforcing bar supports; and 3) English could not verify with certainty in its deposition that Crouch was present for the concrete pour on April 24, 2012, Dkt. 88 at 16 (citing 43-7, Testimony of English 106:05-106:21). Based on English's present theory of liability, none of these complaints warrant excluding Crouch's testimony. Should English seek to elicit testimony relating to events about which Crouch lacks personal knowledge, Defendants may raise an objection on such grounds at trial.

Crouch heard Wahba and Clarke "declare that the rebar was improperly spaced." Dkt. 126 at 9. His personal knowledge in this regard has no bearing on whether he was a foreman assigned to bridge abutments or whether he had personal knowledge of "relevant meetings, discussions, dry runs, wet runs inspections, or notices." Dkt. 43-12, p. 3. His personal knowledge does not at all depend on his presence at the concrete pour subsequent to hearing Wahba's and Clarke's statements. Defendants' motion as to Crouch will be denied.

### 4. Bernard Davis

Defendants did not present any argument at the hearing or in their reply brief with respect to excluding Bernard Davis. English contended that this indicated Defendants had abandoned its motion as it pertained to Davis, and Defendants did not respond to this contention. Dkts. 132, 141, 143. In any event, Defendants' motion as it pertains to Davis is without merit.

Defendants contend that Bernard Davis, "the most senior English employee identified in the contract documents with VDOT, including the QA/QC Plan, as responsible for the project," Dkt. 126 at 9, should be precluded from testifying to any events that predate the April 24, 2012 concrete pour, because he allegedly does not have any personal knowledge of the material events at issue in this case. Defendants cite to the record for evidence that Davis was not on the worksite

on April 24, 2012, Dkt. 43-6 at 99:23-100:2, and that his field personnel sometimes bypassed him on technical issues, *Id.* at 99:5-99:9. In sum, Defendants claim that Davis "abandoned his post as day-to-day manager of the B603 construction" and has no personal knowledge of the decisions made on the site.

English argues that, regardless of where he was the night of the concrete pour, Davis has relevant knowledge related to "bidding and contract documents, QA/QC obligations, the chain of command and responsibility, reporting that occurred on the project, the inspection protocols, the management of documents for the project, his communications on the project with [stakeholders], and authenticity of project records." Dkt. 126 at 10. English contends that Defendants do not seek to exclude any specific statement Davis has or will make, and so they argue that any limitation on his testimony at trial is pure speculation. I agree with English's position. If Defendants find any of Davis's resulting testimony objectionable, they can say as much at trial.

For these reasons, Defendants' motion to Preclude and/or Limit Certain English Witnesses from Testifying at Trial will be **DENIED in full**. Dkt. 87.

## IV. MOTION TO EXCLUDE AECOM SUBCONTRACT

In submitting this motion, English sought to exclude from evidence another subcontract it had with AECOM USA, Inc., for design services. Dkt. 96. Arguing this motion before the Court, Dkt. 141, 143, the parties agreed that the AECOM subcontract may be admitted subject to the limitation that it will not be offered to show that English breached any contractual obligations owed to AECOM in this subcontract. This motion will therefore be **DENIED** subject to this limitation agreed upon by the parties. Dkt. 96.

## V. MOTIONS RELATED TO ENGLISH'S ALLEGED DAMAGES

Finally, Defendants submit two motions *in limine* to preclude English from offering evidence on certain forms of damages. First, Defendants ask the Court to preclude English from offering evidence as to the direct damages it allegedly suffered in rebuilding B603 ("repair damages"), arguing the correct measure of damages is the diminution in the bridge's value as a result of the faulty construction notwithstanding the proper interpretation of the indemnity clauses contained in Defendants' subcontracts with English. Dkt. 93. Second, Defendants ask the Court to preclude English from offering evidence as to the indirect damages English allegedly suffered: the liquidated damages and "contractual disincentives" attributable to English's delay in completing its contract with the VDOT ("delay damages"), as well as other costs incurred by the delay in the bridge's completion. Dkt. 82. English seeks to hold Defendants jointly and severally liable for $1,141,182 in repair damages and $1,647,825 in delay damages. Since these two motions are closely related, they will be addressed together.

### 1. Defendants' joint motion to preclude evidence of English's alleged repair damages

Defendants move the Court *in limine* to preclude English "from offering any evidence of costs that it allegedly incurred to demolish and reconstruct Bridge B603." Dkt. 91 at 1. First, Defendants contend that the correct measure of damages should be limited to the diminution in B603's market value, rather than the measure of costs contemplated in Defendants' subcontracts with English. Second, Defendants argue that English admitted that rebuilding the bridge constituted economic waste, and thus any cost in doing so should not be recoverable.

i.    Proper measure of damages

"Virginia law provides two methods for determining direct damages in a breach of construction contract case." *Cutaia v. Radius Eng'g Int'l, Inc.*, No. 5:11-cv-00077, 2014 WL 3359368, at *4–5 (W.D. Va. July 9, 2014) (Urbanski, J.). "These have come to be commonly designated as the 'cost rule' which is 'the cost of correcting the defects in the [construction] and making it conform to the terms of the contract' and the 'value rule' which is 'the difference between the value of the [structure] properly completed according to the contract and the value of the defective structure.'" *Id.* (quoting *Nichols Constr. Corp. v. Va. Mach. Tool Co., LLC*, 661 S.E.2d 467, 472 (Va. 2008)). However, these means of calculating damages should not override clear contractual language to the contrary. "When there is an express indemnity agreement between a surety and a subcontractor, the 'surety is entitled to stand upon the letter of his contract.'" *XL Specialty Ins. Co. v. Truland*, No. 1:14-cv-1058, 2015 WL 2195181, at *5 (E.D. Va. May 11, 2015) (*quoting Fid. & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir.1983)); *see also W. C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 405 (4th Cir. 2019) ("Indeed the cases cited by RK&K note that where, as here, there is an express indemnification agreement, the terms of that agreement control.").

English's theory of liability is that under certain circumstances, Defendants had a duty to indemnify English against claims involving the manner and sufficiency of the work. If English prevails at trial, its recovery will be based on what is warranted by the indemnity clauses contained in its subcontracts with Defendants. Dkts. 43-4; 43-6. Fourth Circuit precedent forecloses Defendants' attempt to limit such recovery prior to trial based on a measure of damages untethered from the express indemnity clauses. Where an indemnity clause sets the measure of damages to be recovered, that measure of damages prevails. *See W.C. English*, 934 F.3d at 405; *XL Specialty Ins.*

*Co.*, 2015 WL 2195181, at *5. If Defendants wish to argue that the indemnity clause permits English to recover no more than the diminution in market value rather than the cost to repair, it may do so at trial.

        ii.     <u>Economic Waste</u>

        After the faulty bridge construction, during the months-long process where English and VDOT battled over whether B603 had to be rebuilt, English argued in correspondence with VDOT that rebuilding B603 would constitute economic waste and that there were less drastic remedies that could be taken. Dkt. 43-1, ¶¶ 47–50. As a result, Defendants maintain that English is now effectively estopped from denying that the costs incurred during the rebuilding constituted economic waste and are thus not recoverable. *See Nichols Const. Corp*, 661 S.E.2d at 472 ("[T]he cost measure of damages is appropriate unless the cost to repair would involve unreasonable economic waste.") (internal quotations omitted).

        But this argument is clearly at odds with English's purported ability to recover through an indemnification clause. The pertinent question is not whether rebuilding the bridge constituted economic waste, but whether VDOT was within its contractual rights to demand it be rebuilt. Defendants' motion does little more than attempt to turn English's efforts to mitigate damages against them and thus must be rejected. Defendants' motion to preclude evidence of English's alleged repair damages (Dkt. 93) therefore will be **DENIED**.

      **2.  CDM Smith's motion to preclude evidence of English's alleged delay damages**

        English also seeks $1,647,825 in delay-related costs for which it alleges that Defendants are jointly and severally liable. Dkt. 129 at 7. As evidence of these delay damages, English

proposes to call Richard Ott, whom it has designated as a "delay analysis" expert. Dkt. 129 at 5. Defendants move not only to preclude Ott from testifying as to such damages, but to preclude English from offering evidence showing delay damages altogether.

Defendants argue this evidence should be blocked from trial for two reasons. First, Defendants claim that Ott's testimony is insufficient to establish delay damages. While Ott does apportion $1,220,000 of the overall $1,536,000 delay to the reconstruction time for Bridge B603, Defendants argue that his testimony fails to show how much of that $1,220,000 is attributable to CDM Smith or RK&K. Dkt. 83 at 9. Defendants' second argument concerns the fact that English and VDOT engaged in mediation prior to this suit and produced Work Order 13, which underpins the delay damages English now seeks from Defendants. Because English claims that what occurred during this mediation process with VDOT is privileged, Defendants object to English seeking delay damages altogether on the grounds that English has prejudicially withheld crucial information behind a veil of mediation privilege asserted pursuant to Virginia law. Va. Code § 8.01-581.22.

i.    Background

After VDOT concluded that B603 failed to meet the contract's specifications, and after the bridge was demolished and reconstructed to correct this failure, VDOT and English engaged in mediation in early 2016 to resolve all outstanding issues from the project. Dkt 83 at 7. During discovery, namely during depositions and in response to interrogatories, English asserted that what took place during this mediation process was privileged pursuant to Va. Code § 8.01-581.22, and that it is VDOT's privilege to waive.

Pursuant to Work Order 13—the agreement reached between VDOT and English on delay damages—liquidated damages and disincentives were assessed for several discrete periods

between June 2, 2013 to June 24, 2014 for a total of $1,536,000. English (through its expert Ott) attributed $1,220,000 of the $1,536,000 delay cost total to the need to rebuild the bridge. English also seeks $199,735 in extended job site overhead and $228,090 in home office overhead as further indirect damages, for a total of $1,647,825. Dkt. 83 at 6. Ott does not testify as to who was at fault for the need to rebuild the bridge, nor does he apportion the fault between the parties. Dkt. 128 at 6.

      ii.    <u>Sufficiency of Ott's testimony</u>

Defendants argue that "without a scheduling analysis tailored toward the conduct of Defendants, English cannot meet its burden of proving compensable delay." Dkt. 83 at 13. Specifically, Defendants argue English not only needs to show how much of the $1.54 million is attributable to the bridge rebuild—which Ott does—but how much of the cost of the bridge rebuild, $1.22 million, is attributable to each Defendant. The Court disagrees with Defendants' position.

Defendants cite several cases for the proposition that in construction cases, damages must be apportioned among defendants. *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 238–39 (Fed. Cl.2005); *see Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed. Cir. 1982) ("Where both parties contribute to the delay 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.'") (internal citations omitted). First, this principle that Defendants purport to apply to all "construction cases" appears primarily limited to "recovery for government-caused unreasonable delay" for claims brought by government contractors against state or federal governments. *See George Sollitt Constr. Co.*, 64 Fed. Cl. at 238; *Blinderman Constr. Co.*, 695 F.2d at 552; *Driggs Corp. v. Comm. of Va.*, 1996 WL 1065551, at *4 (Cir. Ct. Richmond 1996). Second, these cases refer only to "concurrent delays," which the Federal Circuit has defined as situations "where both parties

contributed significantly to the delay period by separate and distinct actions." *Tyger Constr. Co. v. United States*, 31 Fed. Cl. 177, 259 (Fed. Cir. 1994); *see George Sollitt Constr. Co.*, 64 Fed. Cl. at 238 n.8. There were in fact concurrent delays in this case not attributable to the Defendants, and those were separated out in Ott's analysis by narrowing the $1.54 million total in delay costs to those attributable to the rebuilding of Bridge B603.

But it appears wholly unwarranted to extend this apportionment principle to the alleged failures by CDM Smith, RK&K, and English that resulted in Bridge B603's reconstruction. Based on English's theory of the case, both CDM Smith and RK&K had a duty to follow protocols in the QA/QC plan to facilitate the correction of the improperly spaced rebar, the sole alleged cause of Bridge B603's reconstruction. Put otherwise, English contends that each Defendant's negligence was a sufficient cause of the sole error leading to the Bridge B603's reconstruction. In light of the way English has pleaded its case, it makes little sense for Defendants to then contend that "English cannot prevail unless it apportions a specific number of delay days to the alleged acts or omissions of Defendants." Dkt. 83 at 9.

Furthermore, it is unclear why the evidence English offers, if believed by a jury, would be insufficient to prove its delay damages at trial. Work Order 13 shows English paid nearly $1.54 million in delay damages. Ott is expected to testify that $1.22 million of these delay damages were incurred because of the need to reconstruct B603. English's lay witnesses are expected to testify that the need to reconstruct the bridge was caused by RK&K and CDM Smith's negligence. Finally, English argues that the subcontracts with Defendants make them jointly and severally liable for English's costs incurred by their negligence. The gap in English's delay-damages evidence does not appear to exist.

### iii. Effect of non-disclosed, privileged mediation details

Defendants also seek to preclude Ott's testimony because of English's refusal to disclose what took place during its privileged mediation with VDOT regarding disputes as to the bridge reconstruction as well as other issues unrelated to this case. Defendants argue that (1) English cannot meet its evidentiary burden without disclosing these privileged materials and (2) Defendants have been prejudiced by English's refusal to disclose them. Both arguments fail.

English's mediation with VDOT resulted in Work Order 13, which English relies on to prove its delay damages. Va. Code. § 8.01-581.22 makes confidential "[a]ll memoranda, work products and other materials contained in the case files of a mediator," as well as "[a]ny communication made in or in connection with the mediation, which relates to the controversy being mediated." Furthermore, it states that such materials cannot be produced in discovery unless "all parties to the mediation agree, in writing, to waive the confidentiality." *Id*. Defendants do not appear to question § 8.01-581.22's applicability to this mediation. Dkt. 83 at 12. Furthermore, English cannot waive this privilege alone, as no party indicates that VDOT, as a party to the mediation, has waived its confidentiality here.

First, Defendants allege that English should be barred from proving delay damages by Fed. R. Civ. P. 37(c)(1), which states in part that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Defendants contend that English failed "to produce or make available for inspection all documents supporting each category of the damages it claims in this case." Dkt. 82 at 13. But in contending as much, they relied on Rule 26(a)(1)(A)(iii), which states in full:

Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties: a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, *unless privileged or protected from disclosure*, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

(emphasis added). Defendants argue that by hiding behind "the veil of statutory mediation privilege . . . . English has taken calculated steps to preclude Defendants from understanding why and how they are responsible for the Delay Damages."

Defendants offer little to the Court in what material facts they suspect lays behind this veil of secrecy. As detailed above, Work Order 13 clearly lays out the dates when liquidated damages and disincentives were charged. As to understanding why Defendants are responsible for delay damages, that results plainly from the central theory of this case: their subcontracts with English make them liable for such costs. Defendants are free to present their own measure of damages, or to cast doubt on the substance of Work Order 13 or the credibility of Ott's testimony, but the Court will not preclude evidence because of hypothetically relevant material hidden behind a non-frivolously asserted evidentiary privilege that is not English's alone to waive.

As a final note, Defendants' attack on English's assertion of privilege under Va. Code. § 8.01-581.22 comes too late and in an improper fashion. English asserted this privilege during discovery in witness depositions and in response to Defendants' interrogatories, but it was only after discovery concluded that Defendants brought the present motion. Dkt. 129-9 (English's Objections and Responses to CDM Smith Request for Production Nos. 8 and 12 and RK&K's Request for Production Nos. 10, 14, and 24); Dkt. 83, ¶¶ 14–17 (Defendants' description of English's discovery conduct); Dkt. 32 (Second Amended Pretrial Order). Defendants should have

challenged this asserted privilege through a motion to compel during discovery pursuant to Rule 37(a)(1), rather than ask the Court now to impose the more draconian remedy of a discovery sanction pursuant to Rule 37(c). Fed. R. Civ. P. 37; Dkt. 83 at 11. Even if Defendants are correct that English improperly hid "behind the veil of statutory mediation privilege," Dkt. 83 at 11, Defendants have not justified their failure to raise this issue during discovery where English's asserted privilege could have been properly tested by the magistrate judge. *Calkins v. Pacel Corp.*, No. CIV.A. 3:07CV00025, 2008 WL 149141, at *1 (W.D. Va. Jan. 11, 2008) (describing proper procedure for remedying discovery failures under Rule 37).

For the foregoing reasons, Defendants' motion to preclude evidence of English's delay damages (Dkt. 82) will be **DENIED**.

### Conclusion

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this 3rd day of February, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE