CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
10/13/2021
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| W.C. ENGLISH, INC., | |
| *Plaintiff,* | CASE NO. 6:17-cv-00018 |
| v. | MEMORANDUM OPINION |
| RUMMEL, KLEPPER & KAHL, LLP., *ET AL,* | |
| *Defendants.* | JUDGE NORMAN K. MOON |

**I. Summary**

On June 10, 2021, a jury awarded nearly two million dollars to W.C. English, Inc. in its contract dispute with Rummel, Klepper & Kahl, LLP. It found that the quality assurance subcontract between the parties entitled English to damages or indemnification for costs incurred by English when it was forced to tear down and rebuild an improperly constructed bridge over Interstate 81. RK&K now seeks a directed verdict or, in the alternative, a new trial. Its briefing sets out four arguments for upending the jury's determination. First, that the jury was not provided with sufficient evidence from which it could rationally allocate responsibility between RK&K and others for construction mistakes. Second, that the evidence proffered by English of its damages was improper in various respects. Third, that the Court's failure to accept two of RK&K's proposed jury instructions was error. And fourth, that equitable considerations should have precluded an award of prejudgment interest.

The Court disagrees. The jury had ample evidence from which to make a reasonable determination of fault, and it must be presumed to have followed this Court's instruction that it

1

do so. Neither is RK&K's failure to present certain arguments respecting the damages calculation grounds to convene a new jury or substitute this Court's judgment. With respect to RK&K's rejected jury instructions, RK&K has not offered any reason for the Court to repudiate its trial determination. Finally, Virginia law gives the factfinder complete discretion to award prejudgment interest. RK&K was free to present relevant equitable considerations to the jury at trial. But this Court has no legal basis to throw out the verdict because RK&K failed to do so.

## II. Facts & Trial Evidence

In 2009, the Virginia Department of Transportation ("VDOT") awarded W.C. English, Inc. a $75 million construction contract to build a bridge over Interstate 81 near Lexington, Virginia. English, in turn, retained Rummel, Klepper & Kahn, LLP to provide quality assurance services for the project.

During construction, and after much of the bridge's concrete deck had already been poured, VDOT discovered that the depth of concrete over the deck's rebars was incorrect. The contract between VDOT and English required an 8.5-inch concrete deck reinforced by two separate mats of crisscrossed rebars. English was to leave a 1.5-inch concrete cover beneath the mats and a 2.75-inch cover over the top. To create the proper spacing, English initially installed 2.5-inch slab runners between the two mats. But along the way, a decision was made to insert 1.75-inch slab runners instead. That change was fatal, ultimately lifting the top cover to 3.75-inches instead of the required 2.75. VDOT refused to accept the bridge, and eventually demanded that English demolish and rebuild it. Which English did at a cost of over $2.8 million.

English brought this diversity action against RK&K for breach of contract and indemnification on the theory that RK&K's failure to meet its contractual obligations was, at

least in part, responsible for its $2.8 million loss.[1] This Court initially awarded summary judgment to RK&K, construing the parties' contract to create a species of contributory negligence liability, such that English's own negligence barred any recovery from RK&K. But the Fourth Circuit reversed, finding that an equally reasonable interpretation of the contract would impose a comparative negligence scheme, under which each party would be liable for a percentage of the total loss in accordance with its respective share of fault. Where a contract contains this kind of ambiguity, it is for the factfinder to decide between the competing interpretations. *W.C. English, Inc. v. RK&K*, 934 F.3d 398, 402 (4th Cir. 2019). The Fourth Circuit concluded with an unequivocal assignment of responsibility to the jury: "On remand, it will fall to the factfinder to interpret the relevant aspects of the contract and to determine the effect of any breach by English on RK&K's liability." *Id*. at 405.

  A four-day trial was held, in which both RK&K and English attempted to convince the jury that the other party was primarily to blame for the defects in the original bridge. English offered testimony from its project coordinator, Dylan Frazier, that it was Richard Clarke, RK&K's Quality Assurance Manager, who originally instructed English to switch from the correct 2.5-inch slab-runners to the incorrect 1.75-inch. 1d Tr. 187: 11–14. Frazier also testified that Clarke stopped English's work, threatened to exercise his authority as Quality Assurance Manager to withhold payment from English if the 1.75-inch runners were not substituted, and assured English's on-site employees that the shorter slab runners met the necessary specifications. *Id*. at 187:20–25.

---

[1] English also sued CDM Smith, Inc., which had subcontracted with English to provide quality control services for the bridge construction. But English settled its claims against CDM Smith for $100,000. Def.'s Ex. 49.

English also offered evidence that RK&K conducted dry-run measurements a few days later to ensure that the mats were at the correct height before the concrete was poured. 2d Tr. 104:17–105:18. Those measurements showed that most of the bridge deck was out of specification. *Id*. at 105:21. According to English's evidence, Clarke was told this information. *Id*. at 106:21–107:11. But, also according to English's evidence, neither Clarke nor anyone else at RK&K took action to correct the problem before it was, quite literally, set in stone. 4d Tr. 41:22–42:5. Instead, Clarke completed an inspection shortly before the concrete pour, in which he certified that "spacing, location and edge clearances of all reinforcing mats conform." Pl.'s. Ex. 18; 4d Tr. 44–46.

Contributing perspective to these facts, English provided the jury with the expert testimony of Charles Gee. Gee opined that RK&K failed to meet its standard of care to English. 2d Tr. 172: 8–12. More specifically, he testified that Clarke failed in his standard of care if he threatened to withhold payment if English did not use the shorter, incorrect, slab runners; that Clarke had actual knowledge of the nonconformity that ultimately caused the bridge to be torn down; and that Clarke should not have approved the deck to be poured. *Id*. at 163–173. While everyone shared some blame for what happened, Gee concluded that RK&K's Quality Assurance Manager Richard Clarke bore "primary responsibility" for the cost of removing and replacing the bridge. *Id*. at 168.

Of course, RK&K offered its own version of events. For example, Clarke denied on cross examination that he ever instructed English to use the shorter slab runners. 4d Tr. 52–53. And he testified on direct that he had attempted to convince English's superintendent, Matt Hackney, that the pour should be postponed because the dry run numbers were outside of specification. 4d Tr. 25. RK&K offered evidence that English's superintendent was made aware that the bridge

was outside of specification before the pour by other individuals as well. 2d Tr. 49, 76; Pl.'s Ex. 12, 4/21/2012. Unsurprisingly, RK&K's expert, Kevin Bocock, testified that RK&K *had* met its standard of care and was *not* primarily responsible for the loss because "the whole project team is working together." 4d Tr. 88.

After hearing all the evidence—consisting of twelve fact witnesses, three expert witnesses, and forty-nine exhibits—the jury returned a verdict of exactly 70% of the damages presented by English.

### IIII. Analysis

As mentioned above, RK&K's briefing can be organized into four principal arguments. First, that the jury was not provided with sufficient evidence from which it could rationally allocate responsibility between RK&K and others for construction mistakes. Second, that English's damages evidence is inadequate to support the jury's award. Third, that the Court's failure to accept two jury instructions led to an improper award. And fourth, that prejudgment interest should not have been awarded due to equitable considerations. The arguments are taken in turn.

### A. Sufficiency of Evidence Supporting the Jury Award[2]

It is undisputed that English bears some of the blame for failing to correctly build the I-81 bridge. Indeed, a major theme in English's theory of the case was its embrace of its respective

---

[2] RK&K also argues that the jury's award should be set aside because it "shock[s] the conscience." *See Hughston v. New Home Media*, 552 F. Supp. 2d 559, 565 (E.D. Va. 2008) (citing *Shepard v. Capitol Foundry of Virginia, Inc.*, 262 Va. 715 (Va. 2001)) ("When a verdict is challenged on the basis of alleged excessiveness, a trial court is compelled to set it aside if the amount awarded is so great as to shock the conscience of the court and to create the impression that the jury has been motivated by passion, corruption, or prejudice, or has misconceived or misconstrued the facts or the law, or if the award is so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision.") (cleaned up). The analysis in this section dispenses with that argument, so it will not be treated separately.

responsibility—its own expert testifying that "all parties were responsible," 2d Tr. 168:19, and its last words to the jury being: "Of course we step up and say we could have done things better. Why can't RK&K do that same thing?" 4d Tr. 182:4–5.

Neither does RK&K dispute that a rational finder of fact could find that RK&K's failure to meet its contractual obligations was partially to blame. Instead, RK&K insists that a reasonable jury, based on the evidence presented at trial, could not find that it was 70% responsible.

Jury verdicts are protected by stringent standards of review. A court may only grant a renewed motion for judgment as a matter of law if it finds that "a reasonable jury would not have had a legally sufficient basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). To comply with that standard, a court "cannot substitute its judgment for that of the jury by reweighing the evidence or making credibility determinations." *Id*. And while a court may weigh evidence and consider credibility when deciding whether to grant a new trial, that extraordinary remedy is only appropriate when the verdict is "against the clear weight of the evidence, was based on false evidence, or would result in a miscarriage of justice." *King v. McMillan*, 594 F.3d 301, 314–15 (4th Cir. 2010); Fed. R. Civ. P. 59.

The Fourth Circuit has instructed this Court that "it will fall to the factfinder to interpret the relevant aspects of the contract and to determine the effect of any breach by English of RK&K's liability." *English*, 934 F.3d at 405. This is the law of the case. And the jury was instructed in accordance with it. This Court told the jury:

> If you find that RK&K and English are both at fault under the terms of the QA subcontract, you must determine the effect of any fault by English on RK&K's liability. That is to say, you may find either (1) that the QA subcontract apportions fault between English and RK&K or (2) that English is not permitted to recover any damages under the QA subcontract if it was at fault, regardless of

> RK&K's conduct. If you find that the QA subcontract apportions fault, you must determine what extent English's damage award should be reduced
> 4d Tr. 139:5–14.

From the fact that the jury awarded English precisely 70% of its damages, the Court can only conclude that the jury chose to apportion fault.

The Court cannot say as a matter of law that the evidence was insufficient to enable the jury to rationally allocate 70% of fault to RK&K.[3] A rational finder of fact could credit the testimony of English's expert, Gee, who expressed his opinion that while "all parties are responsible" for the nonconformities in the original bridge, RK&K was "primarily responsible." 2d Tr. 168:19, 169:5. As Gee put it, "when the buck stops, it actually stops with the quality assurance manager." *Id*. at 168:20. And while RK&K offered its own expert, Bocock, to provide the opposite opinion, it was not against the clear weight of the evidence to credit Gee and not Bocock.[4] Putting Gee's testimony together with that of the fact witnesses, the jury could rationally determine that RK&K was contractually responsible for 70% of English's damages.

### B. English's Damages Calculation

---

[3] The parties' extensive discussion of *Hale v. Fawcett*, 214 Va. 583 (Va. 1974) and its progeny is inapposite. Those cases deal with the standard of proof required to attribute some discrete tort injury to a defendant's actions. They do not address the burden of proof to apportion fault between parties who agree that they are both actual ("but for") causes of the same damages in a contract dispute where the contract apportions damages liability according to fault.

[4] RK&K's argument that the jury form should have directed the jury to allocate responsibility among the parties is untimely. Objections to the charge must be made before instructions are given. Fed. R. Civ. P. 51. None were. 3d Tr. 225. Furthermore, at trial the Court asked the parties about requiring the jury to explicitly assign percentages of fault among the various actors. *Id*. at 113. After being given time to consider the issue, English represented that asking the jury "to assign percentages or anything like that" would be inconsistent with the Fourth Circuit's instructions. *Id*. at 114:13–14. On English's reading, the law of the case was that "the jury is going to have to interpret anything and everything in the contract." *Id*. at 114:8–9. RK&K offered nothing to rebut that position. *Id*. at 114.

RK&K raises various objections to the manner in which damages were presented to the jury. Specifically, to the calculation of English's extended home office overhead and to the failure of anyone to ask the jury to account for English's award settlement with another subcontractor.

**(1) Extended Office Overhead**

Part of English's damages calculation was its lost office overhead costs associated with the delays caused by RK&K's breach. RK&K asserts that English's calculation was flawed for three reasons. First, English failed to offer evidence that it could not have recouped its lost overhead with other revenue-producing work. Second, English failed to establish that its overhead expenses were attributable to the I-81 bridge rebuild. And third, English's calculations failed to account for the fact that English itself was partially responsible for the delays.

Under Virginia law, the plaintiff in a contract dispute may recover the general administrative expenses that it takes to run a business, such as administrative salaries and utility bills, that would have been absorbed by revenue-producing work but for delays caused by the defendant's breach. *Fairfax County Redevelopment and Housing Authority v. Worcester Bros. Co., Inc.*, 257 Va. 382, 388 (Va. 1999). *See also Younger v. Appalachian Power Co.*, 202 S.E.2d 866, 868 (Va. 1974) (explaining that overhead expenses associated with fixing a problem caused by defendant's wrongful act are "as much the natural and proximate result of the wrongful act complained of" as any other measure of damages) (internal quotation marks omitted). But the plaintiff must show that it could not have absorbed these expenses by redirecting its administrative resources. *See e.g., Commonwealth v. AMEC Civil LLC*, 280 Va. 396, 422 (Va. 2010) (denying overhead damages because plaintiff failed to offer evidence addressing the issue of whether it could have redirected its labor and equipment to more productive work).

English brought in Richard Ott, an expert in scheduling analytics, 3d Tr. 42:20–23, who testified that there were exactly 164 days of delay to substantial completion caused by the deficient bridge deck: June 20, 2013 to December 1, 2013, *id*. at 55:19–57:23. English also offered extensive evidence of how it was using its resources during this time. The first half was spent in trying to convince VDOT to accept the defective bridge: hiring three independent agencies to conduct analyses, meeting with VDOT officials, and writing letters. 1d Tr. 140–147. English eventually abandoned these attempts on August 16, 2013, when VDOT threatened to place English in default. *Id*. at 145. The period between August 22, 2013 and December 21, 2013 was spent tearing down and rebuilding. *See* Pl.'s. Ex. 57; 1d Tr. 147.

RK&K questioned Ott about whether English behaved reasonably in trying to negotiate to save the bridge, instead of removing and rebuilding it immediately. 3d Tr. 65:23–25. But Ott defended English's actions, arguing that because "removal and replacement of a new bridge deck is a really time consuming and expensive thing", it was "prudent" for English to do so "only after they had exhausted all other options." *Id*. at 66:1–6. The Court cannot say that it was irrational for the jury to agree with Ott on that point. And the time English spent in removing and rebuilding is unassailable.

With respect to the evidentiary objection, English also provided the jury with sufficient evidence from which it could rationally conclude that the I-81 bridge rebuild was responsible for the presented increase in English's general and administrative overhead costs. In addition to Ott's testimony, English brought in its former accountant, Gary Colley, who showed his math[5] and concluded that he was "confident that English actually incurred these expenses as a result of

---

[5] Mr. Colley utilized the Eichleay formula, which the Supreme Court of Virginia has found to be "an acceptable method, though not the only possible method, of calculating the portion of home office expenses attributable to delay." *Fairfax County*, 257 Va. at 390.

this delay." 3d Tr. 75:4–5. It was RK&K's responsibility at trial to provide the jury with any reasons why it should not share Colley's confidence. RK&K did not make any attempt to do so. *Id*. at 75.

With respect to RK&K's objection about allocating liability for overhead costs, the Court has already concluded that the jury could reasonably find RK&K contractually responsible for 70% of English's overall damages, of which English's extended office overhead costs is a part.[6]

**(2) CDM Smith's Settlement Award**

RK&K further asserts that it is entitled to a reduction in its damages award based on English's settlement with CDM Smith, another subcontractor involved in the original bridge construction. RK&K cites Va. Code § 8.01-35.1(A)(1), which provides that "[w]hen a release . . . is given in good faith to one of two or more persons liable for the same injury to a person or property . . . any amount recovered against the other person . . . shall be reduced by any amount stipulated by the covenant or release, or in the amount of the consideration paid for it." Va. Code § 8.01-35.1(A)(1). However, RK&K and English are not both liable for 70% of English's overall damages. *Cf. Llewellyn v. White*, 297 Va. 588, 596 (Va. 2019) (Code § 8.01-35.1(A)(1) entitles a defendant "to a reduction of the judgment entered against him by the amount the plaintiff receives in settlement from another who is also responsible for the *identical* wrong, harm, or

---

[6] In its reply brief, RK&K adds that, as a matter of law, extended office overhead should not have been included in the damages calculation because these constitute consequential damages, and the contract between RK&K and English unambiguously excluded consequential damages. Similarly, in a footnote to its opening brief and in its reply, RK&K objected to the inclusion of the liquidated damages and daily disincentives that English had to pay VDOT. These arguments are waived. *See Grayson O Company v. Agadir International LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue.") (cleaned up).

10

damages as the defendant.") (emphasis added). The jury award reflects the jury's determination of RK&K's share of responsibility alone. Va. Code § 8.01-35.1(A)(1) is inapplicable.

### C. Jury Instructions

RK&K contends that the Court improperly denied two of its proposed instructions. One would have reiterated that RK&K is not responsible for the negligence of another subcontractor. The other would have told the jury that, under Virginia law, the party who commits the first material breach of a contract is not entitled to sue to enforce its terms.

It is the duty of a district court to ensure that jury instructions, "construed as a whole, and in light of the whole record, adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Bailey v. Cnty. of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996) (internal quotations marks omitted). To comply with that duty, a district court must grant instructions that are (1) correct; (2) not substantially covered by the court's charge to the jury; and (3) deal with some point in the trial so important, that failure to give the requested instructions seriously impairs a party's ability to make its case. *Noel v. Artson*, 641 F.3d 580, 593 n. * (4th Cir. 2011).

An instruction clarifying that RK&K should not be held liable for the acts of others was unnecessary because the jury instructions that were given left no confusion that it was RK&K's contractual breach, and no one else's, that was at issue. *See e.g.*, 4d Tr. 136:12–17 (17 ("The issues in this case are: One: Whether RK&K materially breached the QA subcontract with English. Two: If RK&K materially breached the QA subcontract, whether English is entitled to damages or indemnification under the contract."); *Id*. at 135:10-14 ("W.C. English has the burden of proving by a preponderance of the evidence that it suffered damages as a result of a breach of contract by Rummel, Klepper & Kahl and that the QA contract calls for

indemnification by Rummel, Klepper & Kahl."); *Id*. at 140:21–141:2 ("[You shall find in favor of English] if English has proved by the greater weight [of evidence] that: One. RK&K materially breached the QA subcontract with English; and Two. English is entitled to damages or indemnification under the terms of the QA subcontract[.]).

The first material breach instruction was denied because no evidence was offered at trial that English violated a contractual obligation to RK&K.

### D. Prejudgment Interest

The jury awarded English $839,000 in prejudgment interest, with accruement beginning on the date of the bridge's final completion, June 24, 2014. Dkt. 219. RK&K argues that awarding seven years of interest is inappropriate because it was not entirely within RK&K's power to bring this dispute to a swifter resolution. The pandemic, a Fourth Circuit appeal, and three years' delay in commencement of the action were all factors outside of RK&K's control.

But it is not for this Court to decide the legal consequence of these circumstances. *BioVeris Corp. v. Wohlstadter*, 69 F. Supp. 3d 574, 581 (W.D. Va. 2014) ("Virginia law governs the award of prejudgment interest in a diversity case."). And Virginia law delegates to the factfinder complete discretion in awarding prejudgment interest.

Va. Code § 8.01-382 allows the jury to "provide for interest on any principal sum awarded . . . and fix the period at which the interest shall commence." In *Shephard v. Capitol Foundry of Virginia, Inc.*, the Supreme Court of Virginia found this rule to authorize a jury instruction that did nothing to cabin either the principal or the period from which interest accrues. 262 Va. 715 (Va. 2001). The trial judge in *Shephard* instructed the jury that:

> As to interest, you have a choice. You may award interest. You may not award interest. It is up to you. If you do award interest, you have a choice from the date of the accident up until the date of the trial . . . .

>  *Id*. at 722.

RK&K has cited caselaw urging judges, when sitting as factfinders, to hesitate before awarding prejudgment interest in cases where "the problems arose over the interpretation of a contract, prejudgment interest is high, and both parties acted in good faith." *Const'l Ins. Co. v. City of Virginia Beach*, 908 F. Supp. 341, 349 (E.D. Va. 1995). It has also cited caselaw affirming a trial judge's decision to deny prejudgment interest where "a legitimate controversy existed" and "the delay in resolving [the controversy] was not attributable to the parties." *Reid v. Ayscue*, 246 Va. 454, 459 (Va. 1993). But it has failed to cite any post-*Shephard* case in which any Virginia court has overturned a jury award of prejudgment interest.

RK&K also argues, in a footnote, that the Court should have instructed the jury on relevant equitable considerations. Dkt. 232 at 26 n. 4. But the jury instruction on pre-judgment interest in this case was substantively identical to the instruction affirmed in *Shepard*. This Court's instruction stated:

> The award of prejudgment interest is to compensate a plaintiff for the loss sustained by not receiving the amount to which it was entitled at the time it was entitled to receive it. It is within your discretion to award or not to award prejudgment interest.
> 4d Tr. 139:15–19.

Additionally, the verdict form gave the jury complete discretion to choose the date from which interest would begin to accrue. *See* Dkt. 219.

"[T]he trial court need not bear the burden of highlighting helpful arguments nor of marginalizing harmful ones." *Artson*, 641 F.3d at 587. While the equitable concerns raised by RK&K are compelling, it was RK&K's responsibility, and not this Court's, to present them to the jury. *Cf. id.* ("This is what good jury instructions do—let counsel argue factually in terms of

a legal standard, rather than having the judge make counsel's particularized arguments for them.").

The Motion for Judgment as a Matter of Law or, in the Alternative, New Trial, Dkt. 231, will be denied.

The Clerks of the Court is directed to send this Memorandum Opinion and accompanying Order to all counsel of record.

ENTERED: October 13, 2021

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE